

DEFENDANT'S EXHIBIT

## COMPANY AGREEMENT

## OF

## INVICTUS DRILLING MOTORS LLC

This Company Agreement of **Invictus Drilling Motors LLC**, a Texas limited liability company (the "Company"), is entered into and shall be effective as of the 15th day of April, 2022 (the "Effective Date"), among the members signatory hereto.

### ARTICLE I

### ORGANIZATION

**Section 1.01. Formation**   The Company was formed as a Texas limited liability company under and pursuant to the Texas Limited Liability Company Act (the "Act") and other relevant laws of the State of Texas by the filing of its Certificate of Formation with the Texas Secretary of State.

**Section 1.02. Name.** The name of the Company shall be "Invictus Drilling Motors LLC" and all business of the Company shall be conducted in such name. The Company shall hold title to all of its Property in the name of the Company and not in the name of any Member.

**Section 1.03. Registered Office; Registered Agent; Other Offices.**   The registered office of the Company required by the Act to be maintained in Texas shall be the office of the initial registered agent named in the Articles of Organization or such other office (which need not be a place of business of the Company) as the Members may designate from time to time in the manner provided by the Act.   The registered agent of the Company in Texas shall be the initial registered agent named in the Articles of Organization or such other Person as the Members may designate from time to time in the manner provided by the Act.   The principal office of the Company shall be at such place as the Members may designate from time to time, which need not be in Texas.   The Company shall maintain records at an office in Texas selected by the Members as required by the Act.   The Company may have such other offices as the Members may designate from time to time.

**Section 1.04. Purpose.**   The purpose of the Company is to undertake all matters and other purposes for which a limited liability company may be formed under the Act.

**Section 1.05. Company Not a State-Law Partnership.**   The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member for any purpose other than federal and state tax purposes.   This Agreement shall not be construed to suggest or provide otherwise.

**Section 1.07. Title to Property.**   All Property or rights to or in Property held by the Company shall be owned by the Company as an entity.   No Member shall have any interest in or

right to the Company's Property solely by reason of his or her Interest as a Member of the Company. Each Member's Interest in the Company shall be personal property for all purposes.

## ARTICLE II

## MEMBERS

**Section 2.01.  Initial Members, Capital Contributions, and Percentage Interests.** The initial Members of the Company are the Persons executing this Agreement as Members as of the Effective Date of this Agreement, each of which is admitted to the Company as a Member effective contemporaneously with the execution by such Person of this Agreement and the formation of the Company. The number of Units held by each Member and the Percentage Interest for each Member is set out on the attached Schedule A.

**Section 2.02.  Additional Members.**  No Person shall be admitted to the Company as a Member without the unanimous written consent of the then existing Members.

**Section 2.03.  Liability to Third Persons.**   No Member shall be liable for the debts, obligations, or liabilities of the Company, including under a judgment decree or order of a court, unless such Member expressly agrees or consents to such liability.

**Section 2.04.  Duties and Obligations among Members.**   Each Member will have the duties and obligations to the Company and the other Members provided by this Agreement.  In addition, except as otherwise expressly provided by this Agreement or the Act, each Member will have the same duties and obligations to the Company and the Members as a partner of an Texas general partnership has to the partnership and its partners; provided, however, that such duties and obligations shall not extend to any Person other than the Company and the Members, shall not confer any right or benefit on any Person other than the Company and the Members, and shall not limit or restrict in any manner the provisions of Section 2.03 or 2.05.

**Section 2.05.  Waiver of Buyout Rights.**   Except as provided in Article VII, each Member expressly waives any right under the Act to receive any amount in purchase of his or her Interest, to have any amount determined as the value or buyout price of his or her Interest, to bring any action to have a value or buyout price determined under the Act, and to bring any action relating to payment for or payments with respect to his or her Interest except to enforce the specific terms of this Agreement.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

**Section 3.01.  Initial Capital Contributions.**  Contemporaneously with the execution by such Member of this Agreement, each Member shall make its initial Capital Contribution set forth on Schedule A.

**Section 3.02.  Additional Capital Contributions.**  Without creating any right or benefit in favor of any Person other than the Company and the Members, each Member shall contribute to the Company, in cash, on or before the date specified as provided in this Section, that Member's

2

Percentage Interest of all funds that in the judgment of the Members are necessary to enable the Company to cause the business of the Company to be properly operated and maintained and to discharge its costs, expenses, obligations, and liabilities. The Company shall notify each Member of the requirement for additional Capital Contributions pursuant to this Section when appropriate, which notice must include a statement in reasonable detail of the proposed uses of the additional Capital Contributions and a date (which date may be no earlier than the fifth business day following each Member's receipt of its notice) before which the additional Capital Contributions must be made. The additional Capital Contributions will be made by all Members in accordance with their Percentage Interests, unless one or more of the Members voluntarily makes an additional Capital Contribution with the express intention that it not be treated as a loan to non-contributing Members or increase his or her Percentage Interest in the Company.

### Section 3.03.   Failure to Contribute.

(a)   If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Delinquent Member"), one or more of the following remedies:

(i)   Take such action (including, without limitation, court proceedings) as the Company may deem appropriate to obtain payment by the Delinquent Member of the portion of the Delinquent Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Delinquent Member;

(ii)   Permit the other Members in proportion to their Percentage Interests or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Delinquent Member's Capital Contribution that is in default, with the following results:

(A)   The sum advanced constitutes a loan from the Lending Member to the Delinquent Member and an additional Capital Contribution of that sum to the Company by the Delinquent Member pursuant to the applicable provisions of this Agreement;

(B)   The principal balance of the loan and all accrued unpaid interest therein is due and payable in whole on the tenth day after written demand therefor by the Lending Member to the Delinquent Member;

(C)   The loan will bear interest at the Default Interest Rate, from the day that the loan is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member;

(D)   All distributions from the Company that otherwise would be made to the Delinquent Member (whether before or after dissolution of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal);

3

(E)     The payment of the loan and interest accrued on it is secured by a security interest in the Delinquent Member's interest, as more fully set forth in Section 3.03(b); and

(F)     The Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Delinquent Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Delinquent Member;

(iii)     Exercise the rights of a secured party under the Texas Uniform Commercial Code, as more fully set forth in Section 3.03(b); or

(iv)     Exercise any other right or remedy available at law or in equity.

(b)     Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Delinquent Member pursuant to Section 3.03(a)(ii), as security, equally and ratably, for the payment of all Capital Contributions that Member is required to make and the payment of all loans and interest accrued on them by the Lending Members to that Member as a Delinquent Member pursuant to Section 3.03(a)(ii), a security interest in and a general lien on its interest and the proceeds thereof, all under the Uniform Commercial Code. Upon any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Texas Uniform Commercial Code with respect to the security interest granted in this Section. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Company or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Section. At the option of the Company or a Lending Member, this Agreement or a photographic or other copy hereof may serve as a financing statement.

**Section 3.04.  Return of Contributions**.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest with respect to either its Capital Account or its Capital Contributions. An unrepaid Capital Contribution will not be a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**Section 3.05.  Advances by Members**.  If the Company does not have sufficient funds to pay its obligations, any Member(s) may advance all or part of the needed funds to or on behalf of the Company. An advance described in this Section will constitute a loan from the Member to the Company, bear interest at the General Interest Rate from the date of the advance until the date of payment, and not be considered a Capital Contribution.

**Section 3.06.  Capital Accounts**.

(a)     A separate Capital Account shall be established by the Company for each Member.

(b)     There shall be credited to each Member's Capital Account (i) the amount of such Member's Capital Contributions; (ii) such Member's share of the Profits of the Company and any

4

items in the nature of income or gain separately allocated; and (iii) the amount of any Company liabilities assumed by such Member or which are secured by property distributed to such Member.

(c)     There shall be debited against each Member's Capital Account (i) the amount of cash and the gross asset value of any property distributed to such Member by the Company (net of any liability secured by such property that the Member is considered to assume or take subject pursuant to clause (iii) of Section 3.03 (b) above; (ii) such Member's share of the Losses of the Company and of any items in the nature of expenses or losses separately allocated; and (iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(d)     If the Company at any time distributes any of its property in-kind to any Member, the Capital Account of each Member shall be adjusted to account for that Members allocable share (as determined under Section 4.02 below) of the Profits or Losses that would have been realized by the Company had it sold such distributed property at its fair market value immediately prior to distribution.

(e)     In the event the Company makes an election under IRC § 754, the amounts of any adjustments to the basis (or gross asset value) of assets of the Company made pursuant to IRC § □743 shall not be reflected in the Capital Accounts of the Members, but the amounts of any adjustments to the basis (or gross asset value) of Company property made pursuant to IRC §743 as a result of the distribution of property by the Company to a Member (to the extent that such adjustments have not previously been reflected in the Member's Capital Account) shall be reflected in the Capital Accounts of the Members in the manner prescribed in regulations promulgated under IRC §704(b).

(f)     Upon the occurrence of any of the following events, the Capital Account balance of each Member shall be adjusted to reflect the Member's allocable share (as determined under Section 4.02 of this Agreement) of the Profits and Losses that would have been realized by the Company if there were a taxable disposition of all of its property at fair market value (taking IRC § 7701(g) into account) on the date of adjustment to take into account variations between adjusted tax basis and book value of assets within the contemplation of Reg. § 1.704-1 (b)(2)(iv)(f) (4):

(1)     in connection with any Capital Contribution to the Company by any new or existing Member;

(2)     in connection with the liquidation of the Company or any distribution (other than a de minimis amount) or any reduction in a Member's interest; and

(3)     whenever, pursuant to generally accepted industry accounting practices whenever substantially all of the Company's property (other than money) consists of stocks, securities, commodities, options, warrants, futures, or similar instruments that are readily tradable on an established securities market.

(g)     In the event any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest. However, if the assignment of any interest causes a termination of the Company by virtue of Reg. § 708(b)(1)(B), the Capital Account of such interest carried over

to the transferee shall be adjusted in. accordance with Reg. §§ 1.704-l(b)(2)(iv)(e) and (d) to take into account the constructive distribution and constructive re-contribution of the assets of the Company.

(h)    It is the intention of the Members that all Capital Accounts shall be maintained in compliance with IRC §704 and shall be interpreted and applied in a manner consistent with Reg. § 1.704-1 (b). If the Manager reasonably determines, following consultation with the accountant for the Company, that it is prudent to modify the manner in which Capital Accounts or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities secured by property contributed to or distributed by the Company or which are assumed by the Company or any of the Members) in order to comply with Reg. §1.704-1(b), the Manager shall make such modification; provided that there is no material adverse effect upon the amounts otherwise distributable to any Member upon dissolution of the Company. The Manager shall also make (i) adjustments necessary or appropriate to maintain equality between the Capital Accounts of the Members and the total amount of Company capital reflected on the Company balance sheet, consistent with the underlying economic arrangement of the Members based upon federal tax accounting principles in accordance with Reg. § 1.7044(b)(2)(iv)(q), and (ii) appropriate modifications if unanticipated events might cause this Agreement not to comply with Reg. § 1.704-1 (b).

**Section 3.07.  Interest on Capital Accounts.** In no event shall any Member receive any interest on his Capital Account.

## ARTICLE IV

## ALLOCATIONS AND DISTRIBUTIONS

### Section 4.01.  Allocations.

(a)    *Net Profits.*  The Net Profits of the Company, and each item of income, gain, loss, deduction and credit entering into the computation thereof, for each tax year, shall be allocated among the Members in accordance with their Contribution Percentage Interests.

(b)    *Net Losses.*  The Net Losses of the Company, and each item of income, gain, loss and deduction entering into the computation thereof, for each tax year, shall be allocated among the Members in accordance with their Contribution Percentage Interests

(c)    Each item of taxable income, gain, deduction, or loss of the Company in each fiscal year shall be allocated among the Members so as to appropriately reflect the allocation of income, gain, loss, deduction, as the case may be, among the Members pursuant to the terms hereof.

(d)    *Cash Distributions.* Distributions by the Company to the Members, prior to the dissolution of the Company, may be made from time to time, in the discretion of the Managing Members out of Net Cash Receipts available therefor, if, after giving effect to such distribution, the Company shall have sufficient funds available to pay its debts, expenses and to meet its other cash requirements as they become due in the ordinary course of business.

6

**Section 4.02. Special Allocations.** Notwithstanding the provisions of Section 4.01 above, the following allocations of Profits and Losses shall be made:

(a)     *Minimum Gain Charge-back.* Except as otherwise provided in Reg. § 1.704-2(f), if during any fiscal year there is a net decrease in the amount of the Company's minimum gain, each Member shall be allocated items of income and gain equal to that Member's share of the net decrease in its Company's minimum gain, determined in accordance with Reg. § 1.704-2(g), allocated proportionately among the Members based on their respective Percentage Interests. A Member's share of any decrease in the Company's minimum gain resulting from a revaluation of the Company property shall equal the increase in the Member's Capital Account attributable to the revaluation to the extent the reduction in minimum gain is caused by the revaluation. A Member is not subject to the minimum gain charge-back requirement to the extent the Member's share of the net decrease in Company's minimum gain is caused by a guarantee, refinancing or other change in the debt instrument causing it to become partially or wholly a recourse liability or a member non-recourse liability as defined in Reg. § 1.704 (b)(4) and the Member bears the economic risk of loss under Reg. §1.752-2 for the newly guaranteed, refinanced or otherwise changed liability.

(b)     *Member Non-recourse Debt Minimum Gain Charge-back.* Except as otherwise provided in Reg. § 1.704-2(i)(4) if during any fiscal year there is a net decrease in a Member's share of member non-recourse debt minimum gain (being the same as partner non-recourse debt minimum gain defined in Reg. §1.704-2(i)(2), any Member with a share of such member non-recourse debt minimum gain (as determined under Reg. § 1.704-2(i)(5)) as of the beginning of that fiscal year shall be allocated items of income and gain for the fiscal year (and, if necessary, for succeeding fiscal years) equal to that Member's share of the net decrease in such member non-recourse debt minimum gain. A Member's share of the net decrease in a member non-recourse minimum gain shall be determined in a manner consistent with Reg. § 1.704-2.(i)(4). A Member is not subject to this member non-recourse debt minimum gain charge-back, however, to the extent the net decrease arises because a liability ceases to be member non-recourse debt due to a conversion, refinancing or other change in the debt instrument that causes it to become partially or wholly a Company Non-recourse Liability. The amount that would otherwise be subject to the member minimum gain charge-back is added to the Member's share of Company minimum gain.

(c)     *Qualified Income Offset.* If during any fiscal year a Member unexpectedly receives (i) a distribution of any cash or property from the Company to the extent such distributions exceed offsetting increases to such Member's Capital Account that are reasonably expected to occur during such year, or (ii) any other adjustment, allocation or distribution described in Reg. § 1.704-1 (b)(2)(ii)(d)(4), (5) or (6), and, as a result of such adjustment, allocation or distribution, there is a Capital Account deficit in such Member's Capital Account, then items of Profits and gain for such fiscal year (and, if necessary, subsequent fiscal years) shall first be allocated to such Member in an amount and manner sufficient to eliminate such Capital Account deficit as quickly as possible. In no event shall Losses of the Company be allocated to a Member if such allocation would result in or augment such Member's Capital Account deficit.

(d)     *Gross Income Allocation.* If any Member has a deficit Capital Account at the end of any fiscal year, and if the deficit is in excess of the sum of (i) the amount such Member is or becomes obligated to restore pursuant to any provision of this Agreement (if any) and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences

7

of Reg. § 1.704-2(g)(l) and (i)(5), each such Member shall be specially allocated items of Company Profit and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.03 (d) shall be made only if and to the extent that such Member would have a deficit capital account in excess of such sum after all other allocations provided for in this Article have been made, as if Section 4.03 (c) and this Section 4.03 (d) were not in this Agreement.

(e)     *Non-recourse Deductions.* Notwithstanding the foregoing, if there exist Non-recourse Deductions, for any year attributable to a particular Member within the contemplation of Reg. § 1.704-2(i) then such deduction shall be specially allocated to such Member.

(f)     *IRC § 754 Adjustment.* To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to IRC §754 or IRC § 743(b) is required, pursuant to Reg. § 1.704-l(b)(2)(iv)(m)(2) or (m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and, such gain or loss shall be specially allocated to the Members in accordance with their Percentage Interests if Reg. § 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to which such distribution was made in the event Reg. § 1.704-1(b)(2)(iv)(m)(4) applies.

(g)     *Curative Allocations.* The allocations set forth in the preceding Section 4.03 (a) through (f) (the "regulatory allocations") are intended to comply with certain requirements of the regulations promulgated under IRC § 704(b). The regulatory allocations shall be taken into account in allocating other items of income, gain, loss and deduction so that, to the extent possible (consistent with such regulations), the overall amount of profits and losses allocated to each member is the same as if the regulatory allocations had not occurred. Without limiting the generality of the foregoing, but by way of example, if items of loss or deduction are allocated among Members in percentages that differ from their respective Percentage Interests, then, to the extent possible (consistent with such regulations) items of income or gain up to, but not in excess of the cumulative amount of such loss or deduction shall be next allocated among the same Members in the same percentages as the items of loss or deduction were allocated so that the overall allocations to each Member are the same as if the regulatory allocations had not occurred.

(h)     *Allocation of Recapture Income.* Prior to any allocation of profits resulting from the sale or other disposition of any assets of the Company in accordance with Section 4.02, a portion of such profits constituting recapture income shall be allocated as follows:

(1)     In the case of recapture income arising under Code § 1245, to each member in an amount equal to the amount of depreciation deductions allocated to such Member with respect to such asset; and

(2)     In the case of recapture income arising under Code § 1250, to each Member in an amount equal to the excess of the amount of "depreciation adjustments" (as defined in Code § 1250(b)(l) and (4)) allocated or attributable to such Member with respect to such asset over the amount of depreciation adjustments that would have been allocated or have been attributable to such Member had the "straight-line method of adjustment" (as described in Code § 1250 (b)(5)) been employed with respect to such. asset, provided however that in the event the amount of

recapture income arising from the sale or disposition is less than the aggregate amount set forth in clause (1) of (2) (whichever is applicable). The recapture income shall be allocated to Members based on the order in time in which they were allocated depreciation deductions or adjustments with respect to such asset.

     (i)    *Allocations/Partial Years.*

     (1)    Profits and losses shall be allocated among the Members, based upon the portion of the fiscal year in which each is a Member of the Company.

     (2)    To determine when such profits and losses were incurred, the same shall be allocated ratably on a daily basis, or the fiscal year of the Company shall be separated into two or more segments and the profits and losses incurred during each segment shall be allocated to and among those persons who were Members during each segment. The Manager shall elect the method deemed to be the most advantageous to the Company

**Section 4.03.  Determination of Profits and Losses**. Profits and losses for all purposes hereunder shall be computed with the following adjustments:

     (a)    Items of gain, loss, and deduction shall be computed based upon the gross asset value of each of the Company's assets rather than upon each such assets adjusted basis for federal income tax purposes.

     (b)    Any tax-exempt income received by the Company shall be included as an item of gross income.

     (c)    The amount of any optional basis adjustments to any assets of the Company pursuant to Code § 743 shall not be taken into account.

     (d)    Any expenditure of the Company described in Code § 705 (a)(2)(B) (including any expenditures treated as being described in Code § 705 (a)(2)(B) pursuant to the Regulations promulgated under Code § 704 (b)) shall be treated as a deductible expense.

**Section 4.04.  Dissolution/Allocation of Gains and Losses**. Notwithstanding the provisions of Section 4.02 but subject to the special allocation rules of Section 4.03, gains and losses realized by the Company upon the sale, exchange, or other disposition of the assets in connection with the dissolution of the Company shall be allocated in the following manner:

     (a)    In the event any Member has a deficit balance in such Member's Capital Account, there shall be allocated to each such Member a proportionate share of gain (but not loss) determined by multiplying (i) the amount of such gain up to but not exceeding an amount equal to the total of all deficit Capital Account balances; by (ii) a fraction, the numerator of which shall be such Member' deficit Capital Account balance and the denominator of which shall be the total of all deficit Capital Account balances.

     (b)    The balance of any realized gain shall be allocated among the Members in accordance with their Percentage Interests.

(c)     Any losses shall be allocated among the Members in accordance with their Percentage Interests.

**Section 4.05.  Cash Distributions**. Except as otherwise provided in Section 7.06:

(a)     To the extent there is distributable cash, contemporaneously with the filing of the Company's federal return of income (Form 1065) for any taxable period, there shall be distributed from distributable cash to each Member an amount equal to (i) the portion of net taxable income allocated to such Member with respect to such taxable period; multiplied by (ii) the maximum federal income tax rate in effect for such taxable period; less (iii) the amount of any distributions to such Member with respect to such taxable period (other than distributions made pursuant to this Section 4.06 (a)).

(b)     To the extent there is distributable cash, distributable cash shall be distributed not less frequently than quarterly to the Members in accordance with their Percentage Interests.

(c)     In accordance with applicable law, Members may, under certain circumstances, be required to return to the Company, for the benefit of Company creditors, amounts previously distributed as a return of capital. It is the intent of the Members that no distribution to any Member shall be deemed a withdrawal of capital for purposes of determining such creditors rights with respect to such distribution, even if such distribution, for income tax reporting or Capital Account maintenance purposes or otherwise, represents (in full or in part) a return of capital, and no Member shall be obligated to pay any such amount to or for the account of the Company or any creditor of the Company.

**Section 4.06.  Distributions Upon Dissolution**. Upon the dissolution of the Company within the contemplation of Section 11.01, the money and other property of the Company shall be distributed and applied in the following order of priority:

(a)     to the payment of debts and liabilities of the Company (including all expenses of sale) including those owed to Members and their affiliates (provided any debts or liabilities to the Members shall receive priority over those to the Managers) and all unpaid fees owed to the Members under this Agreement;

(b)     to the setting up of any reserves which the Manager may deem reasonably necessary for contingent, un-matured, or unforeseen liabilities or obligations of the Company; and

(c)     to the Members proportionately in accordance with the amounts of their respective positive Capital Accounts, as adjusted.

**Section 4.07.  Compliance with Treasury Regulations**. The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-l(b) and Section 1.704-2, which shall supersede any inconsistent provision in this Agreement, and the provisions of this Agreement shall be interpreted and applied in a manner consistent with such Regulations. The Members shall have the authority in their sole and absolute discretion to make any appropriate modifications in the manner in which the Capital Accounts, or any debits or credits to them, are computed in order to comply with the

Regulations if events might otherwise cause this Agreement not to comply with Section 1.704-1(b) or Section 1.704-2 of the Regulations.

## ARTICLE V

## ACCOUNTING AND RECORDS

**Section 5.01.  Books and Records.**   The Manager shall cause the Company to maintain at the Company's principal place of business separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of the Company business, on such basis or method of accounting as may be determined by the Members, consistently applied. Each Member shall have the right, at any time upon reasonable notice and at such Member's expense, to examine, copy, and audit the Company's books and records.

**Section 5.02.  Tax Returns.**   The Manager shall cause the Company's accountants to prepare all income and other tax returns of the Company and shall cause the same to be filed in a timely manner.  Each Member may, upon request, receive a copy of each such return, together with any schedules or other information which each Member may reasonably require in connection with such Member's own tax affairs.

**Section 5.03.  Tax Matters Partner.**  Jerod Furr shall be the Person designated to receive all notices from the Internal Revenue Service which pertain to the tax affairs of the Company and shall be the "Tax Matters Partner" pursuant to the Code.

## ARTICLE VI

## MANAGEMENT

**Section 6.01.  Management.**   The company shall be member managed.  The initial manager is set forth in the Articles of Organization.  Members holding a majority of the Membership Interests may elect or remove Managers as the Members determine. Managers listed in the Texas certificate of formation and/or this agreement will serve as the Managers of this company until a meeting of members is held and new Manager(s) elected  The Manager shall manage the business of the Company pursuant to the terms of this Agreement. The Manager may appoint officers of the Company (who may or may not be Members) who shall have such powers and authority as are assigned to them by the Manager. Members shall not take part in the operation of the Company's affairs, unless they are elected Managers.

**Section 6.02.  Compensation.**

(a)     The Company may pay to any Manager or Member, in addition to such Manager's share of distributions under Section 4.01, if any, compensation for services rendered to or for the Company approved by the Members.

(b)     Except as otherwise provided in this Agreement, no Manager or Member shall receive any interest, salary, or drawing with respect to his or her Capital Contributions or his or

11

her Capital Account or for services rendered on behalf of the Company or otherwise in his or her capacity as a Member

    **Section 6.03.  Expenses**.    The Manager is authorized to incur reasonable expenses in furtherance of the business of the Company.   The Company will reimburse the Manager for expenditures of this type upon presentation by the Manager at reasonable intervals of an itemized account of those expenditures and approval by the Members.

    **Section 6.04.  Bank Accounts**.   The funds of the Company shall not be commingled with the funds of any other Person and the Manager shall not employ, or permit any other Person to employ, such funds in any manner except for the benefit of the Company.   The bank accounts of the Company shall be maintained in such banking institutions as are selected by the Manager and withdrawals shall be made only in the regular course of Company business and as otherwise authorized by in this Agreement. All cash not otherwise invested shall be deposited in one or more accounts maintained in such financial institutions as the Manager shall select and withdrawals shall be made only in the regular course of Company business on such signature or signatures as the Manager may approve from time to time.

    **Section 6.05.  Insurance**.    The Manager shall procure and maintain, or cause to be procured and maintained, such insurance as may be required by any lender and such additional insurance coverage as the Members may determine is appropriate.

    **Section 6.06.  Restriction on Authority of Manager**.   The Manager is authorized to conduct business on behalf of the Company.  However, no Manager shall do any of the following acts on behalf of the Company without the approval of the Members as provided in <u>Article X</u>:

    (a)    Sell or otherwise transfer, or acquire by purchase, lease, or otherwise, any real property;

    (b)    Give or grant any option, right of first refusal, deed of trust, mortgage, pledge, ground lease, security interest, or otherwise encumber any Property of the Company;

    (c)    Obtain, increase, modify, consolidate, or extend any loan, whether secured or unsecured, affecting the Company, except trade accounts incurred in the ordinary course of the Company's business and not to exceed in the aggregate $1,000 at any time;

    (d)    Spend, or obligate the Company to expend, more than $1,000 in any one transaction or group or series of related transactions;

    (e)    Cause or permit the Company to extend credit to or make any loans or become a surety, guarantor, endorser, or accommodation endorser for any Person;

    (f)    Release, compromise, assign, or transfer any claim, right, or benefit of the Company;

    (g)    Confess a judgment against the Company or submit a Company claim to arbitration or other dispute resolution proceeding;

12

(h)     Distribute any cash or other Property of the Company, other than as provided by this Agreement, or establish any reserve for the Company;

(i)     Admit a new Member to the Company;

(j)     Do any act in contravention of this Agreement or which would make it impossible or unreasonably burdensome to carry on the business of the Company;

(k)     Possess any Property of the Company other than for Company purposes, or assign any right of the Company in any of its Property; or

(l)     Perform any act, or fail to perform any act, that would subject any Member to liability to third persons as a partner (or similar capacity) in any jurisdiction.

### Section 6.07.   Duties and Obligations of Manager.

(a)     The Manager shall take, and the Members shall cooperate in taking, all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of Texas, (ii) for the continuation of the Company's status as an entity treated as a partnership for federal income tax purposes, and (iii) for the accomplishment of the Company's purposes, in accordance with the provisions of this Agreement, the Article of Organization and applicable laws and regulations.

(b)     Except as otherwise agreed in writing between the Company and a particular Member, no Member will be required or expected to devote a substantial portion of his or her time or efforts to or for the Company.

### Section 6.08.   Indemnity; Liability for Unauthorized Acts.    Any Member who acts beyond the scope of his or her authority shall, in addition to any other remedy available to the Company or the Members, be liable in damages to the Company and each Member for any loss or damages that they may incur or suffer as a consequence of such act. The Company shall indemnify any person who was or is a party     defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a     Member of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Members determine that he acted     in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has     no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "*nolo contendere*" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company.

## ARTICLE VII

## TRANSFER OF INTERESTS; WITHDRAWALS

**Section 7.01. Members May Elect to Continue Business Upon Withdrawal of a Member.**  In the event of an "event of dissociation" (as defined in the Act) of a Member, the remaining Members may elect to continue the business of the Company by unanimous written agreement of the remaining Members within 90 days after the event of dissociation.

**Section 7.02. Restrictions upon Transfer of Interest.**  Except as otherwise specifically permitted in this Agreement, no Member shall Transfer all or any portion of his or her Membership Interest or Financial Interest in the Company or any rights therein without the unanimous written consent of the Members.  Any Transfer or attempted Transfer by any Member in violation of the preceding sentence shall be null and void and of no effect whatsoever.  Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company's purposes and the relationship of the Members.  The restrictions on Transfer contained herein shall be specifically enforceable.  Each Member will indemnify and hold the Company and each other Member (and each other Member's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes and costs, including attorney's fees, of enforcing this indemnity) incurred by any of such indemnified persons as a result of a Transfer or an attempted Transfer in violation of this Agreement.

**Section 7.03. Permitted Transfers.**  A Member may Transfer his or her Interest to another Member without further restrictions.  Except as provided in Section 7.04, a Member may not Transfer all or any part of his or her Interest to a Person who is not already a Member, except on the following conditions:

(a)    The transferring Member and transferee shall execute such documents and instruments of conveyance and assumption as may be necessary or appropriate in the opinion of counsel satisfactory to the Company to effect such Transfer and to confirm the transferee's assumption of all obligations of the transferring Member with respect to the Interest being transferred and the transferring Member's full and unconditional guarantee of performance of such assumed obligations;

(b)    The Member shall first give written notice to the Company and to the other Members which includes the name of the person or entity to whom the Member intends to Transfer his or her Interest and the price and terms upon which such Transfer is proposed to be made;

(c)    For a period of thirty (30) days after the receipt of said written notice, the Company shall have the option to redeem all and not less than all of the Interest offered by the Member desiring to transfer his or her Interest.  The price of the Interest being redeemed and the terms of payment shall be the same as though the Member desiring to Transfer had died or dissociated as provided in Sections 7.07 through 7.15;

(d)    If the Company fails to exercise such option, the other Members shall have the option, within thirty (30) days after the termination of the Company's option to redeem, to purchase such Interest (and not less than all of the Interest being offered).  The price of the Interest being

14

sold and the terms of payment shall be the same as though the Member desiring to Transfer had died or dissociated as provided in Sections 7.07 through 7.15. The Members may each purchase such part of the transferring Member's Interest as they may agree (although the total Interest purchased shall not be less than all of the Interest being offered) or absent such agreement in proportion to their respective Percentage Interests; and

(e)     If none of the Interest of the transferring Member is purchased in accordance with Section 7.03(b), (c) or (d), the transferring Member may Transfer his or her Interest to a third Person or Persons during the ninety-day period following the expiration of the thirty-day period referred to in Section 7.03(d), upon such terms as set forth in the written notice as provided in Section 7.03(b). After the expiration of the ninety-day period, no Interest may be Transferred without first being re-offered to the Company and the remaining Members in accordance with Sections 7.03(b), (c) and (d).

**Section 7.04.   Permitted Other Transfer**.  Any Member may Transfer his or her Interest by testamentary instrument or operation of law upon his or her death except that such Transfer shall be subordinate to the right of the Company to purchase such Interest as provided in Section 7.07.

**Section 7.05.   Non-permitted Transfers are Void**.   Any Transfer or purported Transfer of any Member's Interest will be null and void unless made strictly in accordance with the provisions of this Article. The transferee of any Member's Interest in the Company will be subject to all the terms, conditions, restrictions, and obligations of this Agreement, including the provisions of this Article.

**Section 7.06.   Transfers by Operation of Law**

(a)     Notwithstanding anything contained herein to the contrary, if the remaining Members do not approve by unanimous written consent of a Transfer of the transferring Member's Interest to a transferee who is not a Member, and if the Company is nevertheless required by law to recognize the Transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member.  The transferee shall be merely a Financial Interest Owner, and the Interest transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Interest, which allocations shall be applied (without limiting any other legal or equitable rights and remedies of the Company and the remaining Members) to satisfy the debts, obligations and liabilities for damages that the transferor or transferee of such Interest may have to the Company and/or the remaining Members.

(b)     In the case of a Transfer, or attempted Transfer, of an Interest that is not a permitted transfer, the parties engaging or attempting to engage in such Transfer, shall be liable to indemnify and hold harmless the Company and the remaining Members from all costs, liability and damage that any of such indemnified Members and/or the Company may incur (including, without limitation, incremental tax liabilities, attorney's fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

**Section 7.07.   Death or Dissociation of Member**.

(a)    If a Member dies, the Members will have the right to elect to liquidate and retire the deceased Member's Interest.  The Company may elect to liquidate and retire the deceased Member's Interest by so notifying the personal representative of the deceased Member's estate within 90 days after appointment of the personal representative.  The valuation of the deceased Member's Interest and the terms of payment for the Interest will be as provided in Sections 7.08 through 7.15.

(b)    If a Member dissociates from the Company, the Members will have the right to liquidate and retire the dissociated Member's Interest in the Company.  The dissociated Member will become obligated to sell his or her Interest to the Company upon his or her receipt of notice given by the Company of the exercise of its right to purchase  The valuation of the dissociated Member's Interest and the terms of payment for the Interest will be as provided in Sections 7.08 through 7.15.

**Section 7.08.  Price of Deceased or Dissociated Member's Interest.**    The price of a Member's Interest that is to be liquidated and retired by the Company pursuant to Section 7.07 will be the sum of the Member's Capital Account, adjusted to reflect appraised values as provided in Section 7.09, and his or her proportionate share of accrued, but undistributed, net income of the Company at the date the Company becomes obligated to liquidate the Member's Interest as provided in Section 7.07 (the "Date of Obligation").

**Section 7.09.  Appraisal of Certain Company Properties.**

(a)    The values of the Company's assets, other than real property or interests in entities comprised primarily of real property (in either case, referred to as real property in this Section), will be determined as of the Date of Obligation on the same basis as those values are determined in preparing the Company's annual financial statements and will reflect all adjustments necessary to present fairly the financial condition of the Company.  The value of the Company's real property will be the real property's agreed upon or appraised value.  The difference between the total appraised value of all real property and its value as determined under the method of valuation for property other than real property will increase or decrease the Member's Capital Accounts.

(b)    If the continuing Members and the Member whose Interest is being liquidated and retired (the "Liquidated Member") or his or her successor in interest agree upon the value of any real property, that value will be employed for purposes of this Article.  With respect to any real property the value of which cannot be agreed within thirty days after the Date of Obligation, the appraised value of that parcel or parcels will be determined as of the Date of Obligation and will be made by an appraiser selected by agreement between the continuing Members and the Liquidated Member or his or her successor in interest. If they cannot agree on an appraiser within sixty days after the Date of Obligation, an appraiser will be selected by the continuing Members, an appraiser will be selected by the Liquidated Member or his or her successor-in-interest, and a third appraiser will be selected by the other two appraisers.

(c)    If a single appraiser is agreed upon, his or her appraisal of the value of the Company's real property will be the value to be employed for the purposes of this Agreement; that value will not be subject to challenge if the appraisal is made in good faith.  If three appraisers are selected, the high and low appraised values will be ignored and the third appraised value will be

16

the value employed for purposes of this Agreement; that value will not be subject to challenge if the appraisal is made in good faith.  The costs of obtaining any appraisal required by this Agreement will be divided equally between the Company and the Liquidated Member or his or her successor in interest.  No value will be attributed to Company goodwill in any appraisal made under this Section.

**Section 7.10.  Expeditious Determination of Price**.  The parties and their assigns and successors in interest will proceed as expeditiously as possible in determining the price of the Interest of a Liquidated Member.

**Section 7.11.  Full Agreed Price of Each Interest**.  The price of each Member's Interest, as determined pursuant to Sections 7.08 through 7.10, will constitute the full agreed price of each Member's Interest in the Company subject to this Agreement.

**Section 7.12.  Payments to Liquidated Member**.  Payment for the value of a Liquidated Member's Interest in the Company as determined according to the applicable provisions of this Article, will be made by the Company to the Liquidated Member or his or her successor in interest, as follows:

(a)     One third of the principal amount within three months after the Date of Obligation;

(b)     One third of the principal amount, plus accrued interest thereon, within six months after the Date of Obligation; and

(c)     One third of the principal amount, plus accrued interest thereon, within nine months after the Date of Obligation.

The Company may make payments sooner than required under the above schedule with no penalty for prepayment.

**Section 7.13.  Payments of Estimated Amounts**.   If the price of the Interest of a Liquidated Member under this Article VII has not been determined at the time specified for the making of any of the payments provided by Section 7.12, payment will be made by the Company in an estimated amount.  The amount not paid, if the estimated amount is below the actual amount, will bear interest at the General Interest Rate.

**Section 7.14.  Interest on Payments**.  Payments made more than three months after the Date of Obligation will bear interest at the minimum rate provided under Federal income tax laws which will avoid the imputation of interest income for Federal income tax purposes from the Date of Obligation to the date due or the date paid, whichever is earlier.  If any payment is not made on the due date, it will thereafter bear interest at the Default Interest Rate.

**Section 7.15.  Income Tax Incidents of Payments**.  It is the intention of the Members that all amounts payable by the Company under this Article to a Liquidated Member or his or her successor in interest will constitute payment for the interest in Company property.  The payments will be considered a distribution of partnership property under Internal Revenue Code of 1986, Section 736(b), or any subsequent statute of similar import.

**Section 7.16. Covenant Not to Dissociate**.  Except as otherwise expressly required or permitted by this Agreement or required by any transferring provision of the Act, no Member shall voluntarily dissociate from the Company, be entitled to demand or receive a return of such Member's Capital Contributions, profits, or payment for such Member's Interest, or exercise any power under the Act to dissolve the Company in the absence of a determination by the Members under Section 11.01(b) to dissolve, wind up and liquidate the Company.

## ARTICLE VIII

## BREACH OF AGREEMENT

**Section 8.01.  Consequences of Breach**.  Notwithstanding anything to the contrary in the Act, if a Member (a "Breaching Member") (a) attempts to dissociate from the Company or dissolve the Company in breach of Section 7.18, (b) willfully acts or attempts to act beyond the scope of such Member's authority as limited by Section 6.06, or (c) is adjudged liable to the Company or the other Members for any damages resulting from a breach of this Agreement or his or her duties hereunder, the Company shall continue and such Breaching Member shall be subject to this Article.  In such event, the following shall occur:

(a)     The Breaching Member shall immediately cease to be a Member and shall have no further governance rights or power to act for or bind the Company;

(b)     The other Members shall continue to have the right to possess the Company's Property and goodwill and to conduct its business and affairs;

(c)     The Breaching Member shall be liable in damages, without requirement of a prior accounting, to the Company for all costs and liabilities, including attorney's fees, that the Company or any Member may incur as a result of such breach;

(d)     The Company shall have no obligation to pay to the Breaching Member his or her Capital Contributions, capital, or profits, but may, by notice to the Breaching Member within thirty (30) days of his or her breach, elect to make payments to the Breaching Member in complete satisfaction of the Breaching Member's Interest in the Company ("Breach Payments") as provided in Section 9.02;

(e)     If the Company does not elect to make Breach Payments pursuant to Section 9.01(d), the Company shall treat the Breaching Member as if he were a Financial Interest Owner only and shall make distributions to the Breaching Member only of those amounts otherwise payable with respect to such Financial Interests hereunder, and shall have no obligation to purchase the Interest of the Breaching Member;

(f)     The Company may apply any distributions otherwise payable with respect to such Interest (including Breach Payments) to satisfy any claims it may have against the Breaching Member;

(g)     The Breaching Member shall have no right to inspect the Company's books or records or obtain other information concerning the Company's operations;

18

(h)     The Breaching Member shall continue to be liable to the Company for any unpaid Capital Contributions required hereunder with respect to such Interest; and

(i)     Unless the Company has elected to make Breach Payments to the Breaching Member in satisfaction of his or her Interest, the Company may offer and sell (on any terms that are not manifestly unreasonable) the Interest of the Breaching Member to any other Members or other Persons on the Breaching Member's behalf, provided that any Person acquiring such Interest agrees to perform the duties and obligations imposed by this Agreement on the Breaching Member; and

**Section 8.02.  Breach Payments**.  For purposes hereof, Breach Payments shall be made in 20 equal quarterly installments.  The Breach Amount shall be an amount equal to the greater of $1.00 or the Liquidation Value of the Breaching Member's Interest on the day of such breach. "Liquidation Value" means the amount the Breaching Member would receive if the Company were liquidated pursuant to Article X, and its assets sold for book value as of the last day of the calendar month ending concurrently with or immediately preceding the date of the breach.  The Company may, at its sole election, prepay all or any portion of the Breach Payments at any time.  Breach Payments shall be considered a return of the Breaching Member's capital interest in the Company. No interest shall accrue or be paid on or in connection with such payments.  Breach Payments shall commence on the fifteenth day of the month of March first following the end of the calendar year in which the breach occurs.

**Section 8.03.  Exclusive Remedy for Breaching Member**.  This Article provides the sole and exclusive terms and conditions for the purchase of the Interest of a Breaching Member. No dissociated Member who is a Breaching Member shall have any other or further rights with respect to their Interest in the Company except as set forth in this Article VIII.

## ARTICLE IX

## ELECTIONS, APPROVALS, AND AMENDMENTS

**Section 9.01.  Elections and Approvals**.  Except as otherwise set forth in this Agreement, any election or any matter that is subject to approval by the Members shall require the election or approval of Members then holding at least a majority of the Percentage Interests.

**Section 9.02.  Amendments**.  Any amendment to this Agreement shall require the written agreement of the Members holding at least a majority of the Percentage Interests; provided that no amendment shall be made which effectively reduces the Percentage Interest of a Member without the vote or consent of such Member or such Member's receiving adequate consideration therefor.

## ARTICLE X

## DISSOLUTION AND WINDING UP

**Section 10.01. Liquidating Events**.  The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following events (the "Liquidating Events"):

19

(a)     The date on which the period of duration of the Company terminates as provided in the Articles of Organization;

(b)     The vote by Members holding at least a majority of the Percentage Interests to dissolve, wind up, and liquidate the Company;

(c)     The happening of any other event that makes it unlawful or impossible to carry on the business of the Company; or

(d)     Any event which causes there to be only one Member, unless another Member is admitted and the Members elect to continue the Company under Section 7.01.

**Section 10.02. Winding Up.**  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. No Member shall take any action that is inconsistent with, or not appropriate for, winding up the Company's business and affairs. The Member shall be responsible for overseeing the winding up and liquidation of the Company and shall take full account of the Company's liabilities and Property, and the Property shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed in the following order:

(a)     First, to the payment and discharge of all of the Company's debts and liabilities to creditors, including Members who are creditors; and

(b)     The balance, if any, to the Members in accordance with their positive Capital Account balances, after giving effect to all Capital Contributions, distributions, and allocations for all periods.

**Section 10.03. Rights of Members, Liquidation Preference.**  Each Member shall look solely to the assets of the Company for the return of his or her Capital Contributions. No Member shall have priority over any other Member as to the return of his or her Capital Contributions, distributions, or allocations. No Member shall have a right or power to demand or receive Property other than cash from the Company.

<h2 style="text-align:center">ARTICLE XI</h2>

<h3 style="text-align:center">DEFINITIONS AND CONSTRUCTION</h3>

**Section 11.01. Definitions.**  Capitalized words and phrases used in this Agreement have the following meanings:

(a)     "Act" means the Texas Limited Liability Company Act as set forth in the Texas Business Organizations Code, as amended from time to time (or any corresponding provisions of succeeding law).

(b)     "Capital Account" means the separate capital account maintained for each Member in accordance with the Regulations. The provisions of this Agreement relating to Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied

in a manner consistent with such Regulations. If the Members determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed Property or which are assumed by the Company or the Members), are computed in order to comply with such Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article X upon the dissolution of the Company. The Members also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

(c)   "Capital Contributions" means, with respect to any Member, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Company interest held by such Member pursuant to the terms of this Agreement. In the event of the merger of a partnership into the Company, as a result of which former partners of the merging partnership become Members owning more than 50% of the Interests as a result of the merger, the Capital Contributions of such Members shall be deemed to be the amount of their respective capital account balances in the merging partnership as of the effective date of such merger.

(d)   "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(e)   "Default Interest Rate" means a rate per annum to the lesser of (i) 3% plus a varying rate per annum that is equal to the rate publicly quoted in The Wall Street Journal from time to time as the "prime rate" or similar reference rate, with adjustments in that varying rate to be made on the same date as any change in that rate or (ii) the maximum rate then permitted by applicable law.

(f)   "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the book value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning book value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning book value using any reasonable method approved by the Members.

(g)   "Financial Interest" means a Member's or a Financial Interest Owner's share of the Company's net profits, net losses, and distributions of the Company's assets pursuant to this Agreement, the Articles of Organization and the Act, but shall not include any right to participate in the management or the affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members.

(h)     "Financial Interest Owner" means the owner of an Financial Interest who is not a Member.

(i)     "General Interest Rate" means a rate per annum to the lesser of (i) a varying rate per annum that is equal to the rate publicly quoted in The Wall Street Journal from time to time as the "prime rate" or similar reference rate, with adjustments in that rate to be made on the same date as any change in that rate or (ii) the maximum rate then permitted by applicable law.

(j)     "Interest" means the particular interest owned in the Company by a Person whether such interest is a Membership Interest or merely a Financial Interest.

(k)     "Members" means the Persons executing this Agreement as Members and any Person who may subsequently be admitted as a member of the Company. No Person holding only an Financial Interest shall be deemed a Member for any purpose under this Agreement or otherwise.

(l)     "Membership Interest"   means a Member's entire Interest in the Company, including such Member's Financial Interest and all the rights of membership and governance granted pursuant to this Agreement, the Articles of Organization and the Act.

(m)     "Percentage Interest" means, with respect to any Member, the initial Percentage Interest set forth opposite the Members' names in Schedule A or as may be subsequently reflected on the books and records of the Company. A Member's Percentage Interest is such Member's interest in the profits of the Company. The Members' interests in the capital of the Company shall be in proportion to their relative Capital Accounts.

(n)     "Person" means any individual, partnership, corporation, limited liability company, trust, or other entity.

(o)     "Property" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

(p)     "Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations)

(q)     "Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, gift, assignment, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, give, assign, or otherwise dispose of.

**Section 11.02. Construction**.   Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member. The provisions contained in this Agreement are intended to comply with the Act.

**Section 11.03. Headings**.   Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

22

**Section 11.04. Severability.**   Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

**Section 11.05. Variation of Pronouns.**  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require

## ARTICLE XII

### MISCELLANEOUS

**Section 12.01. Notices.**   Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (a) if delivered personally to the Member or (b) whether or not the same is actually received, if delivered by registered or certified mail, postage and charges prepaid, addressed as follows:  if to the Company, to the Company at its then principal offices (or to such other address as the Company may from time to time specify by notice to the Members) with copies to all Members; if to a Member, to such Member at the address then reflected in the Company's books and records as the address for such Member.  Any such notice shall be deemed to be delivered, given, and received as of the date so delivered, if delivered personally, or three business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed as provided in this Section.

**Section 12.02. Binding Effect.**   Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees, and assigns

**Section 12.03. Further Action.**   Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

**Section 12.04. Governing Law.**   The laws of the State of Texas shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.

**Section 12.05. Counterparts**.   This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one instrument.

**SOLE MEMBER**:

AE PARTNERS HOLDINGS INC.

By:

Jerod Furr, Chief Executive Officer

## Schedule A

| Member | Capital Contribution Amount | Percentage Interest |
|---|---|---|
| AE Partners Holdings Inc. | $100 | 100.0% |