1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                       HOUSTON DIVISION

4   IN RE:                        §      CASE NO. 25-30155-11
    ALLIANCE FARM AND RANCH, LLC  §      HOUSTON, TEXAS
5   AND ALLIANCE ENERGY           §      FRIDAY,
    PARTNERS, LLC,                §      MAY 23, 2023
6            DEBTOR.              §      8:01 A.M. TO 10:54 A.M.

7

                    **MOTION HEARING (VIA ZOOM)**

8

            BEFORE THE HONORABLE ALFREDO R. PEREZ
9               UNITED STATES BANKRUPTCY JUDGE

10

11

12      APPEARANCES:                   SEE NEXT PAGE

13      COURTROOM DEPUTY/ERO:          AKEITA HOUSE

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 Eldridge Road, #144
22               Sugar Land, TX  77478
                    281-277-5325
23              www.judicialtranscribers.com

24

        Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

1                      **APPEARANCES (VIA ZOOM)**:

2

3   FOR THE DEBTOR:                 LAW OFFICE OF DEBORAH L.
                                    CRAIN, PC
4                                   Deborah Louise Crain, Esq.
                                    10707 Corporate Drive
5                                   Suite 126
                                    Stafford, TX  77477
6                                   281-565-5777

7                                   OKIN ADAMS, LLP
                                    Timothy L. Wentworth, Esq.
8                                   1113 Vine Street
                                    Suite 240
9                                   Houston, TX  77002
                                    713-228-4100

10

11  FOR DUSTIN ETTER:              HUGHES WATTERS & ASKANASE
                                    Heather Heath McIntyre, Esq.
12                                  TotalEnergies Tower
                                    1201 Louisiana Street
13                                  28th Floor
                                    Houston, TX  77002
14                                  713-590-4243

15                                  IRELAN STEPHENS, PLLC
                                    Noah E. Meek, Esq.
16                                  2520 Caroline Street
                                    2nd Floor
17                                  Houston, TX  77004
                                    713-222-7666

18

19  FOR THE OFFICIAL COMMITTEE
    OF UNSECURED CREDITORS:         DYKEMA GOSSETT PLLC
20                                  William James Hotze, Esq.
                                    Nicholas Zugaro, Esq.
21                                  5 Houston Center
                                    1401 McKinney Street
22                                  Suite 1625
                                    Houston, TX  77010
23                                  713-904-6959
                                    713-904-6900

24

25

1                    **APPEARANCES CONT'D (VIA ZOOM):**

2


3  FOR ERIK AND DARLA OSTRANGER: COKINOS YOUNG
                                 Reagan Tres Gibbs, III, Esq.
4                                Samuel Thomas Pendergast, Esq.
                                 1221 Lamar Street
5                                16th Floor
                                 Houston, TX  77010
6                                713-535-5500
                                 713-535-5569
7

8

9  FOR THE US TRUSTEE:          OFFICE OF THE US TRUSTEE
                                 Ha Minh Nguyen, Esq.
10                               C. Ross Travis, Esq.
                                 515 Rusk Street
11                               Suite 3516
                                 Houston, TX  77002
12                               202-590-7962

13

14

15  (Please also see Electronic Appearances.)

16

17

18

19

20

21

22

23

24

25

4

1                                **INDEX**

2

3    WITNESS:           Direct     Cross     Redirect     Recross

4    JEROD FURR
      By Mr. Hotze      17          .          .            .
5     By Ms. McIntyre   .          28          .            .
      By Ms. Crain      .          45          .            .
6

7    DEBORAH CRAIN
      By Mr. Hotze      60          .          .            .
8     By Ms. McIntyre   .          68          .            .

9

10   EXHIBITS:                   Received

11   Numbers 1 through 32          32

12   Defendant's 96-1              35

13

14                                 ***

15

16

17

18

19

20

21

22

23

24

25

1          **HOUSTON, TEXAS; FRIDAY, MAY 23, 2025; 8:01 A.M.**

2          THE COURT:  Good morning.  It's Friday, May 23rd,

3    2025.  We're here in Case NO. 25-30155, Alliance Farm and

4    Ranch.  There are several matters, including the Motion to

5    Withdraw, the Motion to Convert, and the Motion to Appoint a

6    Chapter 11 Trustee.

7          So, let me first get the appearances of Counsel.

8          MR. WENTWORTH:  Good morning, Your Honor. This is

9    Tim Wentworth, attorney of record for Alliance Farm and

10   Ranch and Alliance Energy Partners.  And Matt Okin is also

11   here on behalf of the same parties.

12         MS. CRAIN:  Good morning.

13         Deborah Crain -- I'm sorry, Heather.  I

14   apologize.

15         Deborah Crain, also on behalf of Jerod Furr, as

16   well as the litigation attorney for Alliance Farm and Ranch,

17   Your Honor.

18         MS. MCINTYRE:  Good morning, Your Honor.

19         Heather McIntyre, of Hughes Watters Askanase,

20   appearing on behalf of Dustin Etters.  And also appearing

21   with me is Abdiel Lopez-Castro, who shows up as Etter's

22   Exhibits on the screen.

23         MR. MEEK:  Your Honor, this is Noah Meek, also

24   for Dustin Etter.  I'm driving to an airport, so I'm just

25   going to be spectating for this hearing.

1          THE COURT:  All right.  Thank you.

2          MR. HOTZE:  Your Honor, William Hotze, with

3  Dykema Gossett on behalf of the Official Committee of

4  Unsecured Creditors.  I'm joined by Nick Zugaro, also from

5  my firm.

6          MR. NGUYEN:  Good morning, Your Honor.

7          Ha Nguyen for the United States Trustee.

8          MR. GIBBS:  Good morning, Your Honor.

9          This is Tres Gibbs.  I'm joined by my colleague,

10  Sam Pendergast, here on behalf of Erik and Darla Ostrander.

11          THE COURT:  Anyone else wish to make an

12  appearance?

13      (No audible response.)

14          THE COURT:  All right.  So, I thought we would

15  take up first the Motion to withdraw.  Does anyone object to

16  that, to the Motion to Withdraw?

17      (No audible response.)

18          THE COURT:  All right.  So, I will go ahead and

19  grant the Motion to Withdraw, and I'll enter that Order as

20  soon as the hearing is over.

21          So, then I think we should take up both the

22  Motion to Convert and the Motion to Appoint a Chapter 11

23  Trustee at the same time, and we'll start with that.  So, I

24  think the Motion to Appoint the Chapter -- to Convert was

25  filed by Ms. McIntyre.

1          So, why don't you go first, Ms. McIntyre or --

2          MS. MCINTYRE:  Thank you, Your Honor.

3          Heather McIntyre on behalf of Dustin Etter.

4          I appreciate the Court's quick hearing on this

5   matter early in the day.  And given the events that have

6   occurred since the last hearing, I think it might be more

7   appropriate for the Committee to move first on its Motion to

8   Appoint a Chapter 11 Trustee, and based on the Court's

9   ruling on that, it might make my Motion to Convert moot.

10         THE COURT:  All right.  Mr. Hotze?

11         MR. HOTZE:  Thank you, Your Honor.

12         William Hotze on behalf of the Committee.

13         If it works for the Court, I might start with my

14  opening statement, and then move to exhibiting exhibits and

15  testimony.

16         There's a lot going on.  There's a lot of moving

17  parts.  There's a lot of complexity to everything that's

18  been going on.  There's been a lot of paper that's been

19  filed, and it seems like a complex process, but I think when

20  you boil this down, Your Honor, it's a pretty simple issue.

21  It is that you have two Debtors who are jointly

22  administered, whose primary assets are litigation claims at

23  this point.  I think Mr. Furr testified to that fact.  The

24  biggest of those litigation claims (indiscernible) right now

25  is a lawsuit against the Ostranders for wrongful

1  foreclosure.  It's listed on the Debtors' schedule.  If you

2  look at the AFR Schedule, it's listed as an asset, and

3  they're requesting about $2.9 million.  To that end, the AFR

4  Debtor sought to retain special counsel due to that

5  litigation, and that litigation has been ongoing in

6  Montgomery County.

7         What we found out over the last week less, than a

8  week, I guess, is that the Debtors' representative has,

9  beginning of this month, entered into a settlement agreement

10 individually with the Ostranders that purported to release

11 all of the Debtors' claims, and the Debtors represented to

12 the Ostranders that he would release them from all of claims

13 related to the wrongful foreclosure and dismissed the

14 lawsuit in exchange for him, personally, in his individual

15 capacity, receiving $1.5 million.  That $1.5 million is

16 obviously property of the estate.  The only Plaintiff in

17 this lawsuit is Alliance Farm and Ranch.  Mr. Furr is not a

18 party to that lawsuit.  He's never owned the property that

19 was foreclosed upon.  These are all assets of the estate.

20 He's a fiduciary (indiscernible).

21        And what the evidence is going to show is that

22 Mr. Furr, as the Debtors' representative, intended to settle

23 this lawsuit on his own, take the million and a half

24 dollars, and the most charitable reading of it is that he

25 was then going to contribute a million of that back into the

1    estate and retain half a million dollars for himself, which,

2    from the viewpoint of the Committee and from the viewpoint

3    of Mr. (indiscernible) at the April 9th hearing, that is, at

4    this point, the only known, solid asset that's going to pay

5    unsecured creditors.  And Ms. Crain, in her response to my

6    motion yesterday, said that the AEP had a million dollar

7    claim and they were unaware of any other claims against

8    Alliance Farm and Ranch, and they don't get to decide what

9    the claim pool is, who has claims, and say, "Okay. Well, we

10   (indiscernible) one claim. We'll pay that one claim in the

11   amount that we think is correct, and then we'll dismiss the

12   case and take property of the estate for ourselves."

13           So, with that, Your Honor, if somebody else wants

14   to make the opening statement, I'll yield the floor, and we

15   can go from there.

16       (Multiple people speaking at once.)

17           MS. CRAIN:  May I, Your Honor?

18           THE COURT:  Yes, yes.

19           MS. CRAIN:  Your Honor, thank you, Your Honor.

20           And thank you, Mr. Hotze, for your opening

21   statement.

22           As the Court is aware, on January 7th, the

23   property, located at 5450 Honea Egypt Road, was foreclosed

24   upon.  As this Court knows, my purpose was to analyze and

25   determine the legitimacy of that foreclosure and get funds

1    that would otherwise not be available to the creditors of

2    Alliance Energy Partners.  But for our efforts and our hard

3    work, there would be zero funds available to the creditors.

4            On April the 22nd, this Court ruled that, AFR

5    does not dispute, the automatic stay does not apply to

6    foreclosure.  As such, the property is not part of the

7    bankruptcy estate.  And as a result of that Court's ruling,

8    we filed, on April the 24th, a Motion to Retain the state

9    court suit, in Docket No 25010068.  This whole issue, of

10   course, was whether or not the foreclosure was proper.

11           A copy of that bankruptcy order to the Motion to

12   Retain was submitted, and I represented to the Court that it

13   was proper for me to proceed in the state court matter

14   because of this Court's ruling.

15           On April the 25th, Mr. Furr asked Mr. Wentworth

16   to file a Motion to Dismiss Bankruptcy since the property

17   was not deemed property of the estate.  Had that Motion to

18   Dismiss been filed, we envision it would have looked

19   something like this, Your Honor.  As Mr. Furr has testified

20   previously in this Court's hearing, he is going to pay back

21   the million dollars attributable to Alliance Energy

22   Partners, which he stated in his schedules is an undisputed

23   million dollars owed.

24           Now, it's come to my attention this week that

25   there are additional claims alleged by Mr. Meek and

1  Mr. Etter against Alliance Farm and Ranch, as well as the

2  Committee has suggested in a Motion to Appoint a Chapter 11

3  Trustee, that there may be additional claims.  I don't

4  disagree that those claims must be decided upon.

5          So, what happens is the Motion to Dismiss gets

6  filed, the settlement is disclosed, and then the Court makes

7  a judicial determination as to the appropriateness of how

8  much money is retained for Alliance Energy Partners and how

9  much is retained for Alliance Farm and Ranch.  It is our

10  position that the sole legitimate creditor is Alliance

11  Energy Partners, but this Court is the sole determiner of

12  that fact.  We do not dispute that.  And we came to be aware

13  of some of the issues concerning the settlement funds this

14  week.

15          Now, there's an issue with regard to how the

16  payment is to be made.  As this Court knows, this matter is

17  a Chapter 11 bankruptcy for both matters.  My client will

18  testify that he went to four banks to establish a

19  Debtor-in-Possession bank account, which is appropriate when

20  you have a Chapter 11 bankruptcy.  Any settlement funds

21  would have been paid into the Debtor-in-Possession account

22  and then dispersed in accordance with the Court's

23  instruction.

24          At no time would my client take personal

25  possession of any settlement funds whatsoever.  The notion

1   is scandalous and false, and certainly, we're going to abide

2   by the Court's instructions.  We picked up the phone being

3   aware of the concerns, and called both Mr. Hotze and the US

4   Trustee, and let them both know that to the extent that

5   there was any question whatsoever about the settlement funds

6   and their current state, we would disperse the entirety of

7   those funds into the Registry of the Court and, as seen in

8   my motion yesterday, sorry, my response to the Creditors'

9   motion, we also submitted a consent order to that effect,

10  saying we're -- to dissuade any kind of notion that we would

11  do something nefarious with any funds.

12           We are willing to just say, "Hey, let's just put

13  it into the Court's Registry, and then the Court can make a

14  determination on who is entitled to what when the Motion to

15  Dismiss is heard."  I believe that is the appropriate course

16  of action, Your Honor.  There's, like I said, no time that

17  my client was going to take personal possession of those

18  funds.  So, I think, with that and our stipulation, you

19  know, we may be able to speed up the process of the Court

20  because I believe that consent order is appropriate, and we

21  certainly do not want to do anything to be a determiner of

22  the funds prior to this Court making that determination.

23  And the appropriate Motion to Dismiss should be heard.

24           I don't know that my client, now that he has no

25  counsel, bankruptcy counsel on a Motion to Convert should be

1    heard at this time, because I am not a bankruptcy lawyer,

2    Your Honor.  So, I would say that we enter the consent order

3    and allow my client to obtain appropriate counsel on any

4    additional motions.

5              Thank you, Your Honor.

6              THE COURT:  All right.  So, who is your client?

7              MS. CRAIN:  Your Honor, I am the litigation

8    attorney for Mr. Furr and Alliance Farm and Ranch.

9              THE COURT:  All right.  And was the lawsuit

10   against the Ostranders non-suited earlier this week?

11             MS. CRAIN:  Yes, Your Honor.  The non-suit -- as

12   part of the title company's requirements, the sale would not

13   go through without it.

14             THE COURT:  Okay.  And what authority -- and the

15   only plaintiff in that case is a Debtor-in-Possession,

16   right?

17             MS. CRAIN:  Yes, Your Honor.

18             THE COURT:  Okay.  And what authority did that

19   Debtor-in-Possession have to non-suit the lawsuit?

20             MS. CRAIN:  As I appreciate your Court Order, the

21   Court Order's ruling deemed it was not property of the

22   estate.  However, I also let the Trustee know, to the extent

23   that the Court would like me to take any action regarding

24   the non-suit, I will take whatever action the Court requires

25   of me.

1          THE COURT:  Ms. Crain, your testimony at the

2    hearing was that the estate had valuable litigation claims,

3    and that was the basis that we consolidated the matter and

4    didn't, you know, dismiss it at that time, because they had

5    valuable litigation claims.  So, the fact that the property

6    was not in the estate is totally different than the lawsuit.

7    The lawsuit was property of the estate.  That was the whole

8    basis of the reorganization was that lawsuit.  I don't

9    understand how a Debtor can dismiss its only asset without

10   Court authority.  I'm just baffled.

11         MS. CRAIN:  Your Honor, again, I was relying on

12   my understanding and appreciation, and also told the

13   Trustee, like I said, to the extent that the Court needs me

14   to do anything contrary, I'm willing to do that.  We

15   obtained, obviously, assets that were valuable to the

16   estate, and I have submitted the consent order to submit

17   those assets to the bankruptcy estate.

18         THE COURT:  Well, I just I'm a little bit

19   speechless, frankly.

20         But let me hear from others.

21         MS. MCINTYRE:  Your Honor, Heather McIntyre, on

22   behalf of Dustin Etter.

23         I would echo Mr. Hotze's comments earlier.  As

24   the Court is aware, there's at least two buckets of property

25   of the estate in the AFR bankruptcy.  There's the personal

1  property listed on the schedule, valued at approximately

2  $200,000.  There are the litigation claims against the

3  Ostranders.  The Court has seen that Mr. Furr, as a

4  fiduciary to the estate, has chosen to dismiss those

5  litigation claims instead of bringing a settlement to this

6  Court via 9019 and allowing the Court and Creditors to see

7  what the settlement is.

8              He, instead, has tried to accept that money on

9  his personal behalf.  And based on that and the filings

10  before the Court, I think that replacing Mr. Furr's

11  fiduciary duty is required, either as through a Chapter 11

12  Trustee or a Chapter 7 Trustee.  And I think once Mr. Hotse

13  admits those documents into evidence, that would be

14  sufficient and require the Court's intervention under these

15  circumstances.

16              Ms. Crain appears to purport to represent AFR and

17  Mr. Furr individually, which appears to be a conflict of

18  interest.  The Debtors' lack competent bankruptcy

19  counsel -- their prior counsel, which is very competent, has

20  withdrawn in this case, and I think that the Court can take

21  judicial notice of the filings and the statements made by

22  prior counsel and draw the conclusions that we need an

23  independent fiduciary duty to protect the interest of

24  creditors in these two bankruptcy cases.

25              Thank you.

1          THE COURT:  All right.  Does anyone else wish to

2   make an opening statement?  Otherwise, we'll proceed to the

3   evidence.

4          (No audible response.)

5          THE COURT:  All right.  Go ahead, Mr. Hotze.

6          MR. HOTZE:  Your Honor, there's one kind of

7   administrative issue.  I filed an exhibit, which was the

8   settlement agreement between Mr. Furr and the Ostranders.  I

9   received it from the Debtors on the condition that I keep it

10  confidential.  This was last Friday when they received it.

11  Given the nature of the contents, I don't know that I have

12  an obligation to keep it confidential.  I filed a Motion to

13  Seal.  I just wanted to understand the Court's preference on

14  how we handle that exhibit, whether I can publish it on the

15  screen, or if you have a preference on that point.

16         THE COURT:  Does anyone object to the settlement

17  agreement being published on the screen?

18         (No audible response.)

19         THE COURT:  All right, no objection.  You can

20  publish it.

21         MR. HOTZE:  Okay.  Your Honor, before we get

22  started, I filed a witness and exhibit list at Docket, I

23  believe, 105.  They're Exhibits 1 through 4.  Exhibit 3, as

24  I noted, was the settlement agreement that I filed under

25  seal.  I move to admit those four exhibits before we start

1   here.

2            THE COURT:  All right.  So, Exhibit 105-1 is the

3   transcript of the April 9th hearing, Exhibit 1-2 is the

4   Notice of Non-suit, Exhibit 105-3 is the settlement

5   agreement, and Exhibit 105-4 is the Declaration of Mr. Furr.

6            Anyone object to the admission of those four

7   exhibits?

8        (No audible response.)

9            THE COURT:  All right.  Hearing no objections,

10  Exhibits 105-1 through 105-4 will be admitted.

11            MR. HOTZE:  Thank you, Your Honor.

12            I'd like to call Mr. Furr as my first witness.

13            THE COURT:  Mr. Furr, would you raise your right

14  hand, please?

15        (The Witness is sworn.)

16            THE COURT:  All right.  Go ahead, Mr. Hotze.

17                    DIRECT EXAMINATION

18  BY MR. HOTZE:

19  Q    Good morning.  My name is William Hotse.  I represent

20  the Official Committee of Unsecured Creditors in this case.

21            You are the managing member of Alliance Farm and

22  Ranch; is that correct?

23  A    Correct.

24  Q    So, you're the sole decision maker for that company,

25  correct?

1  A      For Alliance Farm and Ranch, yes.

2  Q      You're also the controlling president of Alliance

3  Energy Partners Holdings; is that correct?

4  A      Yes.

5  Q      And Alliance Energy Partners Holdings owns 100 percent

6  of Alliance Energy Partners, the Debtors; is that correct?

7  A      AE Partners Holdings owns 100 percent of Alliance

8  Energy Partners.

9  Q      Correct.  And you are the controlling president of AE

10 Partners Holding, correct?

11 A      Correct.

12 Q      So, you're the sole decision maker for both of the

13 Debtors; is that right?

14 A      Yes.

15 Q      Sometime in 2022, Alliance Farm and Ranch bought the

16 5450 Honea Egypt Road property; is that correct?

17 A      You said Alliance Farm and Ranch, correct?

18 Q      Yes, sir.

19 A      Yes.  That's correct.

20 Q      And you lived at that property; is that right?

21 A      I did.

22 Q      But you've never had any ownership interest in that

23 property individually; is that right?

24 A      I created the LLC to purchase, with the intent to

25 purchase the property.

1    Q    Correct.  But the Alliance Farm and Ranch owned the

2    property, right?

3    A    Yes.

4    Q    Okay.  And that property was foreclosed on on January

5    7th; is that correct?

6    A    Correct.

7    Q    And subsequent to that -- well, I guess, let's take a

8    step back.  You filed the Alliance Farm and Ranch bankruptcy

9    on January 7th; is that correct?

10   A    Yes.

11   Q    That was immediately after the foreclosure of the

12   property?

13   A    I believe it came in sometime at 10:45 in the morning.

14   Q    In the bankruptcy case, you filed schedules of assets

15   and liabilities; is that correct?

16   A    Yes.

17   Q    Do you remember signing those documents?

18   A    Yes.

19   Q    On your schedule for Alliance Farm and Ranch, you

20   listed the lawsuit against the Ostranders for wrongful

21   foreclosure as an asset of the estate, correct?

22   A    I don't recall if that was on there or not.  I listed

23   the debt, the mortgage due to the Ostranders, and I listed

24   the $1 million loan due to Alliance Energy Partners.  And I

25   don't have it in front of me.  So, I don't --

1          BY MR. HOTZE:  Okay.  Your Honor, do you mind if

2    I use the share screen?

3          THE COURT:  I'll make you the presenter.

4    BY MR. HOTZE:

5    Q    Okay.  Mr. Furr, do you recognize this document?  Do

6    you see that it says Alliance Farm and Ranch here at the

7    top?

8    A    Yes.

9    Q    And is that your signature right there?

10   A    Yes.

11   Q    I'll represent to you that these are the schedules

12   about liabilities that you prepared and signed in the

13   Alliance Farm and Ranch bankruptcy case.  If we scroll down

14   to -- I apologize for the -- hold on.

15         Right here, do you see question 74?  Right here.

16   A    Yes.

17   Q    In Part 11, it says all other assets.  This is in the

18   asset portion of the schedule that you prepared.

19         Do you see here where it says, where you listed

20   claims against Erik and Darla Ostrander, in *Alliance Farm*

21   *and Ranch, LLC versus Erik D. and Darla Ostrander*, Case

22   25-0100068, pending in the 284th Judicial District Court of

23   Montgomery County, Texas?

24   A    Yes.

25   Q    So, you would agree that you listed the lawsuit

1  against the Ostranders as an asset of your estate, correct?

2  As an asset of the Alliance Farm and Ranch bankruptcy

3  estate, correct?

4  A     Yes, it appears so.

5  Q     Okay.  So, in May of this year -- so, the beginning of

6  this month, you entered into a settlement agreement with the

7  Ostranders; is that correct?

8  A     Correct.

9          BY MR. HOTZE:  I'm going to go ahead, Your Honor,

10 and pull up Exhibit C.  This is the sealed settlement

11 agreement.

12 BY MR. HOTZE:

13 Q     Do you recognize this document?

14 A     Yes.

15 Q     I can blow this up a little more, if that would help.

16 Let me see.  Is this -- scroll down.

17          Is this your signature here at the bottom?

18 A     Yes.

19 Q     Is Alliance Farm and Ranch a party to the settlement

20 agreement?

21 A     Not as it sits on that document.

22 Q     Let me ask that differently.  Alliance Party isn't a

23 party to this settlement agreement, are they?

24 A     Alliance Farm and Ranch was to receive those proceeds.

25 I didn't give them any kind of bank account --

1        BY MR. HOTZE:  I'm going to object, Your Honor,

2   as non-responsive.

3        THE COURT:  Just stay (indiscernible).

4   BY MR. HOTZE:

5   Q    Let me ask that again, Mr. Furr.  Alliance Farm and

6   Ranch isn't a party to the settlement agreement, are they?

7   A    Not as it's written there.  No, but that's not the

8   intention of --

9   Q    Let me ask that again.  It's a yes or no question.  Is

10  Alliance Farm and Ranch a party to this settlement

11  agreement?

12  A    I felt like they always, but as that document reads,

13  it just has my name.

14  Q    Okay.  In this settlement agreement, you represent

15  that you will provide a release to the Ostranders for all of

16  the claims in the wrongful foreclosure lawsuit; is that

17  correct?

18  A    That's correct.  That had to be done in order for them

19  to be able to sell it.

20  Q    And you represented to the Ostranders that you would

21  dismiss the lawsuit; is that correct?

22  A    That's correct.

23  Q    In exchange for this, you were to receive $1.5

24  million; is that correct?

25  A    Yes,  that -- yes.

1          BY MR. HOTZE:  Okay.  Next, Your Honor, we're

2     going to go to Exhibit 2

3     BY MR. HOTZE:

4     Q     Mr. Furr, have you seen this document before?

5     A     Yeah, I saw it in your exhibit.

6     Q     This document is a Notice of Non-suit with prejudice

7     of the loss of AFR's lawsuit against the Ostranders; is that

8     correct?

9     A     Correct.

10    Q     Did you instruct Ms. Crain to file this?

11    A     I did.

12    Q     As the result of this non-suit with prejudice that the

13    lawsuit against the Ostranders was dismissed with prejudice?

14    A     Yes, that's correct.

15          BY MR. HOTZE:  Okay.  Next, Your Honor, we're

16    going to go to Exhibit 4.

17    BY MR. HOTZE:

18    Q     Do you recognize this document, Mr. Furr?

19    A     Yes.

20    Q     Is this your Declaration?

21    A     Yes.

22    Q     Can you can you go ahead and read Paragraph 2 for me,

23    please?

24    A     "It is the position of AFR that it has one Creditor,

25    Alliance Energy Partners, LLC.  As reflected by my

1  testimony -- do you want me to keep reading?

2  Q      Yes.  If you could read the whole paragraph, please.

3  A      "As reflected by my testimony in this case, AFR plans

4  on paying back the $1 million loan from AEP.  Once that is

5  accomplished, AFR has no other legitimate Creditors, and the

6  bankruptcy for AFR should be dismissed.  That is in the best

7  interest of its sole legitimate Creditor, AEP."

8  Q      So, I want to skip to -- as you mentioned a minute

9  ago, under the settlement agreement, when the Honea Egypt

10  property sold, you were to receive a million and a half

11  dollars; is that right?

12  A      Yes.

13  Q      And it's your position and your Declaration that after

14  you receive those proceeds, you're going to distribute a

15  million dollars to AEP; is that right?

16  A      Yes.

17  Q      And then, your intent is to dismiss the Alliance Farm

18  and Ranch bankruptcy case, correct?

19  A      Yes, I thought like it has -- once it pays its

20  Creditor, it doesn't have any reason to be bankrupt.  The

21  sole purpose of bankrupting that entity was to try to stay a

22  foreclosure sale, preserve the excess funds.

23  Q      And your intent, then, was to distribute the $500,000

24  from Alliance Farm and Ranch to yourself; is that correct?

25  A      Pardon me?

1  Q     It was -- your intent, after the bankruptcy case was

2  dismissed, was to distribute the funds remaining in Alliance

3  Farm and Ranch to yourself; is that correct?

4  A     I was going to (glitch in the audio) that legal advice

5  (glitch in the audio) but I felt like the only debt owed

6  from Alliance Farm and Ranch was to Alliance Energy

7  Partners, to repay the million dollar loan that was taken

8  out in April of 2022.  It always sat on our balance sheet.

9  It has never left that.  Don't dispute it.

10 Q     Let me ask my question again.  Maybe I wasn't clear.

11 After AFR -- it was your intent to dismiss the bankruptcy

12 AFR bankruptcy case, but after the case was dismissed, it

13 doesn't have any property, doesn't have real property

14 anymore.  You testified it doesn't have any other assets

15 other than the settlement proceeds.  You would then

16 distribute the funds from Alliance Farm and Ranch to

17 yourself, correct?

18 A     I hadn't made that determination yet.  Like I said, I

19 was going to once I got another bankruptcy attorney, now,

20 but we hadn't given them any bank account information to

21 deposit anything into.  My plan was to deposit all funds

22 into the Debtor-in-Possession account in the first place.

23 So, from that point, I was going to deal with Okin & Adams

24 and see if they felt there was any other viable Creditors.

25         I do not consider Mr. Etter a Creditor.  I think

1  he's got a state case that he's filed that hasn't gone to

2  trial yet.  That could be the only potential Creditor if

3  there's a judgment in his favor for that, but as it relates

4  to other Creditors, the only other Creditor is Alliance

5  Energy Partners, and that's for the sum of a million

6  dollars.

7  Q    Has Mr. Etters sued Alliance Farm and Ranch?

8  A    I believe he's sued every entity.

9  Q    Okay. So, you're aware of a lawsuit against Alliance

10 Farm and Ranch on behalf of Mr. Etter, correct?

11 A    I'm aware.  Yes, I'm aware of the lawsuit.

12 Q    I mean, you've acknowledged there is at least some

13 possibility that Mr. Etter will have a claim against the

14 Alliance Farm and Ranch, right?

15 A    Absolutely not.  I disagree with (glitch in the

16 audio).

17          BY MR. HOTZE:  Okay.  One moment, Your Honor. Let

18 me see if there's anything else I want to bring up.

19 BY MR. HOTZE:

20 Q    Mr. Furr, on the day that you filed the bankruptcy

21 case, did you transfer $70,000 from the AFR bank account to

22 your personal bank account?

23 A    I don't know.

24 Q    You don't know?

25 A    I don't recall.

1  Q    Have you ever transferred $70,000 or roughly that

2  amount from the AFR bank account to your personal account?

3  A    Have I ever?

4  Q    Yeah.

5  A    I don't know.  I've transferred money from the AFR

6  account to my personal account a few times.

7  Q    So, it's your testimony that you don't recall whether

8  you did or did not transfer $70,000 to your personal account

9  from the AFR bank account on the day that you filed the

10 bankruptcy?

11 A    I don't recall that.

12 Q    Can you confidently say that you didn't do that?

13 A    You're asking me for hypotheticals.  I really don't

14 know.  It happened --

15 Q    Mr. Furr, I'm not asking you a hypothetical.  I asked

16 you if you transferred $70,000 from the AFR bank account to

17 your personal bank account on the day that you filed for

18 bankruptcy.

19 A    I don't know.

20 Q    Can you can you confidently tell the Court that you

21 did not transfer $70,000 from a bank account to your

22 personal account on the day you filed the bankruptcy?

23 A    I could not --

24      MS. CRAIN:  Objection; asked and answered, Your

25 Honor.  I believe he's asking this question several times

1  now.

2           THE COURT:  Overruled.

3           Go ahead.

4  BY MR. HOTZE:

5  Q    Would you like me to repeat the question, Mr. Furr

6  A     No, I answered it.  I said I couldn't confirm or deny

7  that.  I don't know the answer to your question.

8           BY MR. HOTZE:  Okay.  Your Honor, I don't have

9  any more questions for Mr. Furr.

10           THE COURT:  All right.  Any other examination of

11  Mr. Furr?

12           MS. MCINTYRE:  Your Honor, Heather McIntyre from

13  Mr. Etter.  I do have questions for Mr. Furr, if I may.

14           THE COURT:  Go ahead.

15                    CROSS-EXAMINATION

16  BY MS. MCINTYRE:

17  Q    Hello, Mr. Kerr.  Good morning.

18           Why was Alliance Farm and Ranch formed?

19  A    Pardon me?

20  Q    Why did you form Alliance Farm and Ranch, LLC?

21  A    I formed it to purchase the property at 5450 Honea

22  Egypt Road.

23  Q    Did it have any operations?

24  A    Not at the time that I formed it, no.

25  Q    Does it have any operations now?

```
 1  A     The property is (glitch in the audio) any longer.

 2  Q     Does AFR have any employees?

 3  A     No.

 4  Q     Does AFR have any income?

 5  A     No.

 6  Q     You testified earlier that you and your family lived

 7  on the ranch owned by AFR.

 8          Did you pay any rent to AFR for living on its

 9  property?

10  A     No.

11  Q     Do you have a personal bank account ending in 2389?

12  A     Yeah.

13  Q     And where is that bank account located?

14  A     Frost.

15  Q     Did you do any remodeling projects on the ranch?

16  A     Yes, quite a few.

17  Q     And which -- who did you use for the remodeling

18  projects on the ranch?

19  A     I used a company called Louis Martinez.  I used Mary

20  Ross.  I used Pro Paving.

21  Q     Did you use an outfit called Arroyo Remodeling?

22  A     I did, yes.

23  Q     And how did you pay for the remodeling projects that

24  occurred on the ranch?

25  A     I tried to delineate between what was done in the shop
```

1  and what was done in my house, but they (glitch in the

2  audio).  So, Alliance Energy Partners paid quite a few of

3  those invoices, just for Arroyo remodeling.

4  Q     What is your connection with the companion Debtor,

5  Alliance Energy Partners?

6  A     What is my relationship with them?

7  Q     Yes.  You're the majority owner of the holding company

8  that owns AEP; is that right?

9  A     Correct.

10 Q     And what are AEP's current operations?

11 A     They don't have any operations currently.

12 Q     When did they cease operating?

13 A     Sometime in October.

14 Q     And where -- when was AEP formed?

15 A     Early November, October of 2020.

16 Q     And where did it operate from at that time?

17 A     The reason we operated out of (glitch in the audio)

18 and then we also had --

19 Q     Was that in Spring?

20 A     Yes.

21 Q     Pardon me.

22          So, when AEP was operating out of the Spring

23 location, did it pay rent for the facilities that it

24 operated from?

25 A     We didn't have any -- we rented everything that we

1  had, so we didn't (indiscernible) any space.  It was -- I

2  believe that was only for maybe a month that it operated out

3  of there.  It was kind of started on a short notice (glitch

4  in the audio) --

5  Q    Historically, has AEP's rent been less than $5,000 a

6  month?

7  A    Yeah.  Originally, not historically.

8  Q    When was its rent more than $5,000 a month?

9  A    When we were required to have our own motors and we

10 needed to -- we're trying to expand our business, so we

11 needed a facility to house and (glitch in the audio) --

12 Q    Going back to AFR, on the schedules, you listed

13 personal property of AFR, including things like tractors and

14 farm equipment for the ranch; is that correct?

15 A    Correct.

16 Q    Where is that personal property now?

17 A    Still out there.

18 Q    Have you made any attempts to sell that personal

19 property?

20 A    No, ma'am, it's part of the real estate transaction.

21 Q    So, you attempted to sell that personal property as

22 part of the sale of the real property known as the ranch?

23 A    Correct.  When I purchased the property, all those

24 tractors came with it as (indiscernible) items.  There were

25 a few more things out there at the time.  There was

 1   probably, you know, (indiscernible) and things like that,

 2   some farm accessories (indiscernible).

 3            BY MS. MCINTYRE:  Your Honor, I filed a witness

 4   and exhibit list at Docket No. 80, with Exhibits 80-1

 5   through 80 --

 6            THE COURT:  33.

 7            MS. MCINTYRE:  33.  Thank you, Your Honor.

 8            May I -- I move to admit those exhibits into

 9   evidence, please.

10            THE COURT:  All right.  Let's go through them.

11   Exhibit No. 1, 80-1 is the Emergency Motion to Convert.

12   I'll take judicial notice of that.  It's just a filing.

13            Exhibit No. 2 is the contribution agreement.

14            Does anyone object to the admission of the

15   contribution agreement?

16        (No audible response.)

17            THE COURT:  All right.  That will be admitted.

18            Exhibit No. 3 is the AEP Frost Bank account

19   statements for April to June 2022.

20            Exhibit No. 4 is the AEP vendor report for Erik

21   Ostrander.

22            Exhibit No. 5 is the June 2022 ACH ledger.

23            Exhibit No. 6 is the November-December 2022 ACH

24   ledger.

25            Exhibit No. 7 is the Texas franchise Report for

1    J. Parker Construction.

2              Exhibit No. 8 is the April-December 2022 ACH

3    ledger.

4              Exhibit 9 is the ranch real estate note.

5              Exhibit 10 is the list of equity holders.

6              Again, that is a filing in the Court, which I

7    will take judicial notice of.  Let me go back.

8              Exhibit No. 11 is the Plaintiff's eighth amended

9    petition.  Again, that's a pleading in court.  I'll take

10   judicial notice, but not for the facts of the matter.

11             Exhibit 12 is the Deed of Trust.

12             Exhibit 13 is the contract between the Ostranders

13   and the Milners.

14             Exhibit 14 is the order denying the emergency

15   Motion to Dismiss.  I'll take judicial notice of that.

16   Exhibit 15 is the transcript of the hearing.  I'll take

17   judicial notice of that.

18             Exhibit 16 is Defendant's answers to Plaintiff's

19   second set of interrogatories.

20             Exhibit 17 is the farm and ranch contract of the

21   Ostranders and AEP.

22             Exhibit 18 is the receipts and disbursements.

23   Let me see what that is.  Oh, it's the receipts and

24   disbursements ledger for the sale of the property dated

25   January 20th, 2022.

1            Exhibit 19 is the ranch contract.

2            Exhibit 20 are the remodel invoices.

3            Exhibit 21 is the commercial lease for the ranch.

4            Exhibit 22 is just the Debtor's emergency Motion

5    to Reschedule.  I'll take judicial notice of that for the

6    fact that it was filed, not for the truth of the matter.

7            Exhibit 23 is the Notice of *Lis Pendens*.

8            Exhibit 24 is the emergency Motion to Expunge the

9    list.  Again, I'll take judicial notice of the fact that it

10   was filed, not for the truth of the matters.

11           Exhibit No. 25 is the Notice of Submission of the

12   Motion to Expunge.  I'll take judicial notice of that, not

13   for the truth of the matter.

14           Exhibit 26 is AFR's bankruptcy petition.  I'll

15   take judicial notice of that.

16           Exhibit 27 is AFR's Schedules A, B, D, E, F, G,

17   and H.  I'll take judicial notice of those filings.

18           Exhibit 28 is for SOFAs.  I'll take judicial

19   notice of that.

20           Exhibit 29 is AEP's petition and schedules.  I'll

21   take the official notice of that.

22           Exhibit 30 is the Notice of Foreclosure Sale.

23           Exhibit 31 is the ranch improvement payment

24   totals.

25           Let's see what's next.  Exhibit 32 is the

 1  American Express bank statements, and

 2          Exhibit 33 is the Declaration of (indiscernible).

 3          Again, the Declaration of (indiscernible) is

 4  hearsay.  So, I'm not going to admit that, but with respect

 5  to the other exhibits that I didn't take judicial notice of

 6  for the fact of the filings, does anyone object to their

 7  admission?

 8      (No audible response.)

 9          THE COURT:  All right.  Those exhibits will be

10  admitted.

11      (Exhibits Numbers 1 through 32 received in evidence)

12          THE COURT:  Go ahead, Ms. McIntyre.

13          MS. MCINTYRE:  Thank you, Your Honor.

14          Also, there was a supplemental exhibit list filed

15  at Docket No. 96 that I would like to move to admit,

16  Exhibits 906-1 through 96-5.

17          THE COURT:  Okay.  Exhibit 96-1 is the Alliance

18  Farm bank statements.

19          Exhibit No. -2 is the first amended Wrongful

20  Foreclosure Petition.  Again, I'll take judicial notice of

21  that for the fact that it was filed.

22          Exhibit No. -3 is the non-suit. I'll take

23  judicial notice of that.

24          Exhibit No. -4 is the dismissal with prejudice of

25  the foreclosure lawsuit.  I'll take judicial notice of that.

1   And Exhibit No. 43 is the transcript of the April 9th

2   hearing.  I think that was already admitted, but I'll

3   take -- again, I'll take judicial notice of that.

4           So, the only exhibit here that isn't a filing is

5   Exhibit No. 1.  It's the Alliance Farm bank statements.

6           Does anyone object to the admission of those

7   exhibits, of that exhibit?

8       (No audible response.)

9           THE COURT:  All right.  Hearing none, Exhibit

10  96-1 would be admitted.  The other ones, I'll take judicial

11  notice of for the fact that they were filed.

12      (Exhibit 96-1 received in evidence)

13          MS. MCINTYRE:  Thank you, Your Honor.

14  BY MS. MCINTYRE:

15  Q    Mr. Furr, AE Partners Holdings has an entity named

16  Invictus Drilling; is that right?

17  A    Correct.

18  Q    And Invictus Drilling has a bank account ending in

19  7447; is that correct?

20  A    I don't remember.  It has a bank account at Frost

21  Bank.

22  Q    Okay.  And does AE Partners Holdings have a bank

23  account ending in 7404?

24  A    I believe so.

25          BY MS. MCINTYRE:  And I'm going to direct your

1  attention -- Your Honor, if I might have Abdiel Lopez-Castro

2  be able to put up exhibits to share his screen?

3           THE COURT:  Sure.

4           Mr. Castro, why don't you turn on your camera for

5  a minute?

6           MS. MCINTYRE:  It seems to have dropped from the

7  screen.

8           THE COURT:  Let's see if I can find him.  No, I

9  don't see him on here.

10           MS. MCINTYRE:  Okay.

11           UNIDENTIFIED MALE SPEAKER:  I believe he's listed

12  under Etter's Exhibits HWA

13           THE COURT:  Got it.  Okay.  Got it, got it, got

14  it.  Okay.

15  BY MS. MCINTYRE:

16  Q    Great.  I'd like to draw your attention to Exhibit

17  96-1, which has been admitted before the Court.

18           BY MS. MCINTYRE:  Mr. Castro, if you're able to

19  get that exhibit up.

20           MR. CASTRO:  Can you hear me?  It's not giving

21  me -- give me one second.  Okay.  I think it's ready to go.

22  Okay.

23           MS. MCINTYRE:  Okay.  And 96-1, I show that's PDF

24  Page 39.  So, if anyone's following along on PACER on the

25  docket, it would be 96-1.  It's a 308 page PDF.  I'm going

1   to start with Page 39 of 308.

2          (Pause in proceedings.)

3              MS. MCINTYRE:  Your Honor, I apologize.  I don't

4   know.  If I have the sharing screen capabilities, I'll do my

5   best to pull that up.

6              THE COURT:  Okay.

7              MS. MCINTYRE:  I have it on my screen.  I just --

8              THE COURT:  There you go.

9              MS. MCINTYRE:  Okay.  Thank you so much.

10         (Pause in proceedings.)

11             THE COURT:  I have another hearing at 10:00.  So,

12  okay.  If we do that, that's fine.  But if we come to a

13  stopping place, we'll take about a 15 minute break, and then

14  we'll come back.  So, why don't you go ahead --

15             MS. MCINTYRE:  Thanks, Your Honor.

16             THE COURT:  -- and finish this question, and then

17  we'll break till 10:15.

18             MS. MCINTYRE:  Okay.

19             THE COURT:  9:15.  I'm sorry.

20             MS. MCINTYRE:  Oh, okay.  Thank you, Your Honor.

21  That clarifies it for me.

22  BY MS. MCINTYRE:

23  Q    Okay.  Mr. Furr, I'd like to draw your attention to

24  what's appearing on the screen as a bank statement, and this

25  is the Alliance Farm and Ranch Frost bank statement for

1  January of 2025.  Earlier, you testified that your personal

2  bank account is 23, ends in 2389, and here it's showing that

3  there was a withdrawal from the AFR bank account for $70,000

4  into your personal bank account.

5          Do you see that?

6  A    Yes.

7  Q    Does that refresh your memory that you, on the day of

8  filing, transferred $70,000 from the Debtor to your personal

9  bank account?

10 A    It appears so, yes.

11 Q    And what was the basis for that withdrawal?

12 A    I recall I hadn't paid myself anything from the

13 company.

14 Q    And what did you perform for the Debtor?  What did you

15 do for the Debtor, AFR?

16 A    All the maintenance of the cattle.

17 Q    And you hadn't paid yourself salary for a while then;

18 is that right?  That was your salary; is that your

19 testimony?

20 A    I hadn't taken any salary at all.  So --

21        BY MS. MCINTYRE:  Thank you, Your Honor.  Thank

22 you.  Moving on to the next question.  Asked and answered.

23 BY MS. MCINTYRE:

24 Q    If you back up, if you look at the prior page, you'll

25 see on the screen here the transfer from the AFR bank

1  account to you for $3,000, less than a month before that

2  $70,000 withdrawal.

3          Do you see that?

4  A    Yes.

5  Q    And so, you directed AFR to send that money to you

6  personally; is that correct?

7  A    Oftentimes, I would take money to cover expenses

8  (glitch in the audio) it was common for --

9  Q    It's a yes or no question, Mr. Furr.  You directed AFR

10  to send $3,000 to yourself on December 9th, 2024?

11  A    It appears that way.

12  Q    And did you do that again --

13          BY THE COURT:  All right, why don't --

14          MS. MCINTYRE:  Go ahead.  Yes, Your Honor.

15          THE COURT:  No.  Why don't we stop right here,

16  and then we'll come back around 10:15.  Let me call my

17  10:00.  My 9:00.  I'm sorry.

18          MS. MCINTYRE:  Thanks, Your Honor.  Thank you,

19  Your Honor.

20          THE COURT:  All right. Why don't you stop sharing

21  your screen?

22          Thank you.

23      (Recess taken from 9:01 a.m. to 9:21 a.m.)

24          THE COURT:  I apologize, I took a little bit

25  longer than I thought it was going to take, but we're now

1  back on the record in Case No. 25-30155, Alliance Farm and

2  Ranch.

3          MS. MCINTYRE:  Thank you, Your Honor.

4          Heather McIntyre, I'll continue with the Frost

5  Bank statements of AFR, and I'm working -- is

6  Mr. Furr -- there you are, Mr. Furr.

7          Thank you.  Thank you for your presence here

8  today.

9                  CROSS-EXAMINATION (CONT'D)

10 BY MS. MCINTYRE:

11 Q    I'll draw your attention to the September 2022 Frost

12 Bank statement of Alliance Farm and Ranch.  On the screen,

13 you'll see that this is showing the deposits into the AFR

14 bank accounts are coming from Alliance Energy and Invictus

15 Drilling at $20,000 each.

16         Did you direct Invictus and Alliance Energy to

17 deposit those funds into AFR?

18      (No audible response.)

19          BY THE COURT:  I think you may be muted.

20 Mr. Furr?

21 BY MS. MCINTYRE:

22 A    Yes, those were lease payments.

23 Q    And then, here again in November, isn't it true that

24 you directed Invictus and Alliance Energy to deposit $20,000

25 each into the AFR bank account?

1   A      Yes.

2   Q      And again, in December and January, in those months as

3   well?

4   A      Yes.

5   Q      Was there a lease agreement between AFR and Invictus?

6   A      No, it was just a month-to-month.  It just started

7   (glitch in the audio).

8   Q      For AFR's note that the Ostrander's, was the interest

9   rate 6 percent?

10  A      As I recall.  Something --

11  Q      And is there any written note between AFR and AEP?

12  A      Currently?

13  Q      Was there ever a note between AFR and AEP for the

14  alleged million dollar loan that you listed on AFR

15  schedules?

16  A      No, I just put it on the -- I just got it on the

17  (indiscernible).

18  Q      Isn't it true there's no interest being paid by AFR to

19  AEP for the money that AFR used --

20  A      That's correct.

21  Q      -- from AEP?

22  A      That's correct.

23  Q      And directing your attention again to 96-1, this is

24  the May 2023 statement of AFR.

25              Isn't it true that you directed AFR funds of

1   $32,000 to your personal account here?

2   A     It appears so.

3   Q     And you did it again the next month?  In June '20, you

4   directed AFR funds of $20,000 to yourself?

5   A     It appears.

6   Q     And again, in July, you received $16,000 from AFR?

7   A     Correct.

8   Q     Is there a written agreement between AFR and yourself

9   for any salary?

10  A     No written agreement.

11  Q     And again, in August of 2023, you directed AFR to send

12  you $10,000?

13  A     It appears so, yes.

14  Q     And isn't it true you do that again in September for

15  $20,000?

16  A     It appears so, yes.

17  Q     And again in November for $5,000?

18  A     Yes.

19  Q     And again in December for $20,000?

20  A     Yes.

21  Q     Would it be fair to say that you directed AFR to send

22  you money, at least on a monthly basis, for amounts varying

23  from $4 to 70,000?

24  A     I routinely would transfer myself money to cover

25  expenses or -- I mean, yeah.

1  Q     And did AFR receive any money from any source besides

2  Invictus and Alliance Energy Partners?

3  A     No.

4  Q     I'd like to draw your attention to Exhibit 80-18.

5  It's the receipts and disbursements ledger.

6           Did you cause AEP to provide the earnest money

7  and the down payment, essentially, for the ranch?

8  A     Yeah, that was the million dollar loan.

9  Q     The alleged million dollar, 0 percent interest loan?

10 A     (Indiscernible).

11 Q     And I'm going to draw your attention to Exhibit 80-20.

12 These are the remodeling invoices that have been entered

13 into evidence.  You testified earlier that you had some

14 remodeling done.  I'll draw your attention to the screen

15 that shows this invoice going to Alliance Energy, Jerod, for

16 drywall on master bathrooms, entry halls, bedrooms, offices,

17 living room, laundry, etc.

18           What benefit did AEP get for remodeling your

19 house?

20 A     I don't believe -- you know, they didn't get any

21 benefit from it, I don't suppose.  A tax write-off.

22           BY MS. MCINTYRE:  Your Honor, we also uploaded

23 exhibits at Docket No. 84.  I'd like to move to introduce

24 the exhibits at Docket 84 into evidence.  These are 84-1

25 through 84-5.

 1          THE COURT:  All right.  Does anyone object to the

 2   admission of 84-1 through 84-5?  First one is the Mercedes

 3   sales contract; second one is Mercedes Application for

 4   Title; the third one is an email from, it appears to be from

 5   Mr. Furr, Alliance Energy Partners, transmitting a balance

 6   sheet dated February 2nd, 2022; and then, Exhibit 84-4 is an

 7   email.  I'm sorry.  It's the federal statement for AEP.  The

 8   client here is AECOM.  And then Exhibit 84-5 is the second

 9   set of written interrogatories propounded by counsel for AEP

10   Holdings, AEP, AE Partners, AEP Asset Holdings, Alliance

11   Energy Partners, Alliance Farm and Ranch, Invictus, and

12   Corina Furr and Jerod Furr.

13          Does anyone object to the admission of these

14   exhibits?

15       (No audible response.)

16          THE COURT:  Exhibits 84-1 through 84-5 are

17   admitted.

18          MS. MCINTYRE:  Thank you, Your Honor.

19          At this point, I'd like to pass the witness.

20          THE COURT:  All right. Thank you.

21          Anyone else wish to cross-examine?

22          MS. CRAIN:  I would, Your Honor.

23          THE COURT:  Okay.  Go ahead.

24                    CROSS-EXAMINATION

25   BY MS. CRAIN:

1  Q     Good morning, Mr. Furr.

2            Can you tell the Court do you recall your

3  testimony in April of this year regarding the bankruptcy and

4  the loan that we've discussed here today?

5  A     Yes.

6  Q     Can you tell the Court what you recall about the

7  million dollar loan that we've discussed here today, whether

8  or not you dispute that loan?

9  A     I did not dispute it.  I always maintained that

10  Alliance Farm and Ranch owed that to Alliance Energy

11  Partners.

12  Q     And in fact, Mr. Furr, did you list that on your

13  schedules for Alliance Farm and Ranch as an undisputed

14  amount?

15  A     I did.

16  Q     Do you believe that Alliance Energy Partners is owed

17  any additional amount over the million dollar loan?

18  A     I do not.

19  Q     You're aware that Mr. Etter has filed a claim, but do

20  you dispute that claim?

21  A     I do.

22  Q     Are you aware that Mr. Etter has those several claims

23  pending in state court regarding the issues brought before

24  the Bankruptcy Court today?

25  A     Yes, I'm aware of them.

1  Q      And consistent with the prior testimony in court, you

2  asked me to determine the validity of the foreclosure sale

3  as it pertains to the property located at 5450 Honea Egypt

4  Road, correct?

5  A      Correct.

6  Q      And then, I filed an amended suit.  What else happened

7  subsequent to that in terms of the Bankruptcy Court filings

8  and rulings?

9  A      The Court ruled that the property wasn't part of the

10 estate.

11 Q      And what did you do as a result of that ruling in

12 terms of requesting action in the Alliance Farm and Ranch

13 bankruptcy?

14 A      I wanted to file a petition against the Ostrander's

15 and try to collect the additional funds, but I originally

16 asked Okin & Adams to drop the suit, because I felt

17 like -- and I may have misunderstood the ruling, but I

18 thought that he ruled that the property wasn't part of the

19 estate, the bankruptcy came in too late, and it was, you

20 know, no way to go through bankruptcy to get that money

21 back.

22 Q      Do you recall asking that the Alliance Farm and Ranch

23 bankruptcy file a Motion to Dismiss on or about April the

24 25th, 2025?

25 A      Yes.

1  Q     Did that happen?

2  A     No.

3  Q     As part of that Motion to Dismiss, would you have

4  willingly disclosed that you were in negotiations with the

5  Ostranders, and that a settlement was in the works, and that

6  basically there was a settlement being discussed?

7  A     Yes.

8  Q     And would you've also disclosed in that Motion to

9  Dismiss that you were willing to pay the million dollars

10 that you believe is owed to the Alliance Energy Partners?

11 A     Yes, correct.

12 Q     And what happened after filing the amended suit?

13 A     I was contacted by Erik Ostrander.  I believe it was

14 on the 21st or 22nd, sometime around there in April, asking

15 me if he wanted to settle it.  I think it was originally

16 scheduled to close on the 24th of April.

17 Q     So, time was of the essence?  Time was of the essence

18 because the sale was set to happen on April the 24th?

19 A     That's correct.

20 Q     Did you and Mr. Ostrander come up with the essential

21 terms of the settlement?

22 A     Yes.

23 Q     Can you tell the Court what efforts you personally put

24 in to ensure that a fair price was negotiated for the

25 settlement to get the maximum amount for the creditors of

1  Alliance Energy Partners?

2  A     Yes.  Originally, he was going to take the property

3  and list it for $5.9 million, which would have left no

4  proceeds in excess.  Essentially, hardly any money left

5  over.  I was dealing with the buyers at that point, and I

6  negotiated the price to 6.9 -- $6.8 million for the sales

7  price to ensure that, you know, at minimum, we could get

8  back $1 million, because I felt like that was the right

9  thing to do to try to get creditors paid.  A lot of these

10 people are my friends, people I've worked with for many

11 years.  So, I wanted to try to get them, you know, maximize

12 their return.

13         So, I negotiated the price up.  And Mr. Ostrander

14 and I had an agreement he was going to pay anything over the

15 $4.5 million that they felt that they were owed, and he

16 subsequently changed his mind, which caused me to seek legal

17 representation to try to preserve that, because he just said

18 (indiscernible) nothing.

19 Q     Would it be fair to say, Mr. Furr, that but for our

20 combined efforts in following the amended suit and working

21 with the Ostranders to increase the sale price, that this $1

22 million, a total of $1.5 million, would not be available for

23 the bankruptcy estate of Alliance Energy Partners and

24 Alliance Farm and Ranch?

25 A     Yes, I would say that.  Definitely.  Absolutely.

1  Q      Now, was your intention in having the agreement naming

2  you as payable to subvert the bankruptcy process and direct

3  payment to your personal account?

4  A      No, ma'am.

5              MS. CRAIN:  Your Honor, I filed yesterday six

6  exhibits.  If I may share my screen. Your Honor?

7              THE COURT:  Yes.

8  BY MS. CRAIN:

9  Q    I'm turning to what was previously filed as Document

10 No. 143, Exhibit 3, which -- Mr. Furr, can you identify this

11 document?  At the top, it provides that it is the company

12 agreement for Alliance Farm and Ranch, a Texas limited

13 liability company.

14              Do you see that?

15              BY THE COURT:  I think you may be looking at your

16 wrong screen.  This one has the -- the one that I'm seeing

17 has your digital notebook, and it's it appears to be a

18 pleading.

19              MS. CRAIN:  Okay, Your Honor.  Forgive me.  This

20 system is a little bit different than -- it only wants to

21 allow me to share a -- hang on, Your Honor.

22 BY MS. CRAIN:

23 Q      Well, I'm going to ask you, Mr. Furr, what can you

24 recall about your operating agreement and 8.3 being the

25 liquidating agent for Alliance Farm and Ranch?

1  A     I'm the sole liquidating agent for Alliance Farm and

2  Ranch.

3  Q     So, consistent with the winding down of Alliance Farm

4  and Ranch, which is essentially a defunct entity, you

5  entered into a settlement agreement for the purposes of

6  obtaining settlement funds for the bankruptcy estates of

7  both Alliance Energy Partners as well as Alliance Farm and

8  Ranch; is that correct?

9  A     That's correct.

10  Q     And you previously testified you entered into a

11  settlement agreement on or about May 6th, 2025, correct?

12  A     Correct.

13  Q     As a result of the settlement agreement, have you

14  personally received any funds?

15  A     No.

16  Q     And you were in court on Tuesday, May the 20th,

17  correct?

18  A     Yes.

19  Q     And what concerns did you become aware of at that

20  time?

21  A     Payment of the settlement agreement.  I realized there

22  were issues which I didn't -- there were issues with -- I

23  guess people took issue with it being in my name, which it

24  wasn't my intent to take the proceeds and run off with them.

25  I've always asserted that the debt to be paid back to

1  Alliance Energy Partners.  Alliance -- I was in the process

2  of trying to get a Debtor-in-Possession account opened.  I

3  hadn't provided the Ostranders with any bank information to

4  deposit the proceeds into.  I was waiting to get that

5  account created and provide that to them.

6  Q    And how many attempts did you have -- to get a

7  Debtor-in-Possession account did you make?

8  A     I drove around to four banks, and not one of

9  them -- and they were on the list of banks approved by the

10 Trustee.  None of them, except for the last one, even knew

11 what a Debtor-in-Possession account was.  And that lady to

12 help me there at Truist Bank first told me they didn't know

13 what that was, and then I showed them the document and said,

14 "Well, it says you guys do that."

15          So, she had to call 4 or 5 people, and they

16 didn't know.  As I'm walking out, they grabbed me back and

17 said they found somebody.  And so, I submitted the documents

18 that they asked for, and they said that legal has to approve

19 it, and then they emailed me back subsequently the next day

20 that legal didn't approve it.

21 Q    And took these actions in believing that you were

22 complying with being a Chapter 11 Trustee for the estates of

23 both of these matters, and you were required to do that by

24 the Bankruptcy Court, correct?

25 A     Yes.

1  Q      Now, as a result of the concerns on May the 20th,

2  2025, what additional steps did you ask me to take to assure

3  the Trustee and Mr. Hotze that the settlement funds would be

4  secured for the bankruptcy estate prior to any distribution?

5  A      I instructed you to contact them if that's what you're

6  referring to.  And let them know --

7  Q      I'm sorry.  I didn't hear you.

8  A      I said I instructed them to contact you to make them

9  aware that I planned on moving that money or taking those

10 proceeds and paying back Alliance Energy Partners.

11 Q      And then --

12 A      I asked you to reach out to the --

13 Q      Go ahead.

14 A      -- US Trustee and let him know.

15 Q      Yes.  And in fact, to your knowledge, I did

16 communicate with both the US Trustee and Mr. Hotze regarding

17 these issues to assure them that these proceeds would be

18 paid and made part of the bankruptcy estate prior to any

19 distributions whatsoever to yourself, correct?

20 A      That's correct.

21 Q      And in terms of the sale of the subject property, it

22 is likewise coming up.

23         Do you know when the sale of the property is

24 scheduled to take place?

25 A      Sometime next week, I believe.

1   Q     Would it be fair to say Tuesday, this coming Tuesday?

2   A     I think so.  I think that's what I heard.

3   Q     And so, Monday's a holiday.  And if -- what is your

4   understanding what would happen to the sale of this property

5   if we have not filed a non-suit this week?

6   Q     It would have got delayed for the third time.

7   Property is very difficult to sell.  There's not a lot of

8   people with that kind of money.  Your buyer base is really

9   small.  I mean, before I bought it, I think it sat on the

10  market for two years at a much lower price.  These folks

11  have been delayed two to three times now, and I feel like it

12  was in jeopardy of losing the deal altogether.  And then

13  finding another buyer could take another 6 or 8 months.

14  Q     So, but for our efforts this week, there's a strong

15  possibility that there might not be any funds available for

16  these Creditors; would that be fair to say, Mr. Furr?

17  A     Yes, I believe that.  I think, being delayed twice,

18  people will probably get a little bit of -- give them a lot

19  of time to get cold feet on a deal like this.  And it isn't

20  pretty seamless, and I think it puts some doubt in people's

21  minds.  I know with mine.

22  Q     Now, as a result of the Creditors' Motion to Appoint a

23  Chapter 11 Trustee, you instructed me to file a consent

24  order with the Court allowing the entirety of the settlement

25  proceeds to be paid into the Registry of the Court, correct?

1    A       That's correct.

2    Q       And have you read and do you approve of a copy of that

3    consent order?

4    A       Yes.

5    Q       And according to the Motion to Appoint a Chapter 11

6    Trustee, it's believed that AEP is owed more than a million

7    dollars from Alliance Farm and Ranch.

8              Are you aware of any evidence to substantiate

9    this assertion?

10   A       No.

11   Q       So, in your Motion to Dismiss that was filed this

12   week, you filed a Declaration based on your personal opinion

13   that Alliance Farm and Ranch does not owe any additional

14   monies to Alliance Energy Partners, correct?

15   A       That's correct.

16   Q       And you do understand that Judge Perez is the ultimate

17   determiner of fact on that Motion to Dismiss, and to the

18   extent that additional claims are made, those claims will

19   have to be decided and asserted prior to Alliance Farm and

20   Ranch or any other individual receiving any funds from the

21   property of the estate?

22   A       Correct.

23   Q       Now, the settlement was for 1.5 million, but is it

24   your understanding that this Court also has ruled that the

25   personal property as part of the sale cannot be sold along

1  with the land?

2  A     I was made aware of that, yes, recently.

3  Q     Are you also willing to enter a consent order to the

4  Court to allow that personal property to be sold to get the

5  maximum price of the $1.5 million, consistent with the

6  settlement agreement?

7  A     Yes.  I was originally negotiating with the buyers,

8  and as part of that agreement, you know, that original

9  contract, those items were listed as non-realty items to go

10 with the sale of the property.  They came with the property

11 when I purchased it.

12 Q     And to the extent that they're not made part of the

13 sale that is happening on Tuesday, will the settlement

14 agreement of the $1.5 million have to be adjusted downward?

15 A     I believe.  Yeah.  I mean, absolutely, it would have

16 to be.

17 Q     And then Alliance Farm and Ranch will be responsible

18 for selling that personal property and putting those

19 proceeds into the bankruptcy estate, correct?

20 A     Correct.

21 Q     And are you -- do you believe that that personal

22 property is worth $500,000 or less?

23 A     I believe it's worth less.

24 Q     So, to the extent that the consent order is not

25 issued, the Creditors of Alliance Energy Partners and/or

1    Alliance Farm and Ranch would receive less proceeds from the

2    settlement agreement, correct?

3    A     Correct.

4    Q     Now, you do understand, as part of the Motion to

5    Dismiss, the Court could deny the Motion to Dismiss.

6              Are you willing to abide by the terms and

7    conditions of the Court for both Alliance Energy Partners as

8    well as Alliance Farm and Ranch?

9    A     I am.

10   Q     You'll do whatever the Court asks you to do, correct?

11   A     That's correct.

12   Q     Now, Ms. McIntyre asked you about distributions and/or

13   payments received from Alliance Energy Partners to Alliance

14   Farm and Ranch, or payments that went towards the

15   improvements thereof.

16             Can you tell the Court a little bit about the

17   distributions that you and Mr. Etter agreed to in 2022 that

18   reflect those payments?

19   A     Yeah, I mean, I -- in August of 2022, I gave Dustin,

20   Mr. Etter, a $350,000 disbursement to compensate him for any

21   repairs that were done to the house that were charged to the

22   company (indiscernible), we tried to keep things as even as

23   possible.  In order to bridge that, I give them a $350,000

24   disbursement so that he could buy a ranch for himself up in

25   North Texas.

1  Q      And that $350,000 distribution to Mr. Etter is part of

2  the exhibits that were filed by Mr. Etter through

3  Ms. McIntyre, correct?

4  A      Correct.

5  Q      And was that on or about August the 1st, 2022?

6  A      Yes.

7  Q      Did Mr. Etter have knowledge that Alliance Farm and

8  Ranch was going to purchase the property located at 5450

9  Honey Egypt Road?

10 A      Yes, he was aware.

11 Q      Did he consent or make any kind of written objections

12 to that purchase?

13 A      Not until August of 2024.

14 Q      And did he know about the lease payments that

15 Ms. McIntyre referenced, the $20,000 payments that were

16 discussed?

17         BY MS. MCINTYRE:  Objection, Your Honor.

18 Objection, Your Honor.  I don't think Mr. Furr can testify

19 as to what Mr. Etter knew or didn't know, or when he knew or

20 did not know it.

21         MS. CRAIN:  Your Honor, they're business

22 partners, and I think that whether or not he gave consent is

23 an issue in this case, and I think Mr. Furr can testify as

24 to whether or not he objected to those lease payments.

25         MS. MCINTYRE:  The question wasn't about consent.

1   It was whether Mr. Etter knew or didn't know in the time

2   frame of what he knew and when he knew it.

3               MS. CRAIN:  I think you're muted, Your Honor.

4               THE COURT:  The question that I had is, the

5   Motion to Convert and the Motion to Appoint a Trustee really

6   pertained to post-petition conduct.  In other words,

7   anything that happened from the date of the filing going

8   forward, you know, while all of this may be relevant, very

9   relevant with respect to any potential claims or people's

10  motivation, I think, you know, I'm willing to listen to it,

11  but what I'm really focused on is what happened, you know,

12  from the day they filed through, you know, yesterday,

13  because that's the evidence that I need to consider.

14              The pre-petition conduct, you know, maybe the

15  subject of a claim, or maybe the subject of a lawsuit, or

16  maybe the subject of something else, but it's really not

17  particularly relevant.  May be relevant to show motive, but

18  is not particularly relevant to the consideration of, you

19  know, the dismissal of a Chapter 11 Trustee or conversion.

20              MS. CRAIN:  All right, Your Honor.  Thank you,

21  Your Honor.  Then I'll pass the witness.

22              THE COURT:  Anyone have any further questions?

23              MR. HOTZE:  None from the Committee, Your Honor.

24              MS. MCINTYRE:  No, thank you, Your Honor.

25              THE COURT:  All right.  Thank you, Mr. Furr.  You

 1  may be excused.

 2        (Witness steps down.)

 3              THE COURT:  All right.  Does the Committee have

 4  any further testimony or witnesses?

 5              MR. HOTZE:  Your Honor, real briefly, I'd like to

 6  call Ms. Crain.

 7              THE COURT:  Okay.

 8        (The Witness is sworn.)

 9              THE COURT:  All right.  Go ahead, Mr. Hotze.

10                     DIRECT EXAMINATION

11  BY MR. HOTZE:

12  Q    Ms. Crain, a couple of questions.  So, you're the

13  lawyer for Alliance Farm and Ranch in the Ostrander

14  litigation, correct?

15  A    Correct.

16  Q    And you also represent Mr. Furr; is that right?

17  A    Yes, as a member of Alliance Farm and Ranch, that is

18  essentially a defunct entity.  You wind down, and there's a

19  liquidation agent, and then basically, that person is

20  designated to be able to wind down the affairs of the

21  company, but it's really in connection with his being a

22  member of Alliance Farm and Ranch.

23  Q    Okay.  Let me ask that question a little more clearly.

24        Do you represent Mr. Furr in his individual

25  capacity?

1  A      Not in this context in this bankruptcy or the

2  litigation matter, except to the extent that he was sued in

3  a litigation matter individually.  So, yes.  So, not for the

4  bankruptcy in the context of separation from Alliance Farm

5  and Ranch.  But even in the litigation matter, you know,

6  it's a piercing corporate veil.  So, I think it's still

7  connected to Alliance Farmer Ranch.

8  Q      You received a retainer of $15,000 from Mr. Furr

9  personally, correct?

10  A      I could not tell you what account that came from, so I

11  cannot answer that question.  I did receive retainer funds.

12  Q      Let's do this then.

13         BY MR. HOTZE:  Your Honor, do you mind if I have

14  the screen?

15         THE COURT:  Yes.  Go ahead.

16  BY MR. HOTZE:

17  Q      Okay.  Ms. Crain, do you recognize this document?

18  A      Yes.

19  Q      Is this your Declaration?

20  A      I think it was prepared by Mr. Wentworth, but yes, I

21  believe that I signed it.

22  Q      Is that your -- Did you affix your signature at the

23  bottom of this document?

24  A      Yes, yes.

25  Q      Okay.  So, just to refresh your recollection, in

1  Paragraph 11, where it says, "I shall receive an initial

2  $15,000 retainer from Jerod Furr," did you ever receive that

3  retainer?

4  A    Not in connection with this.  So, the Application for

5  Employment was never approved, so I did not receive that

6  retainer as set forth under the bankruptcy code.  I did

7  receive a retainer, though.

8  Q    Who'd you receive a retainer from?

9  A    I received a wire transfer.  I'd have to look at my

10 records.

11 Q    How much does that wire for?

12 A    The initial wire was $10,000.

13 Q    Were there subsequent wires?

14 A    I believe there was an additional check for $10,000,

15 and I don't recall without looking at my accounting records

16 what else.

17 Q    Who was the check from?

18 A    I don't recall without looking at my accounting

19 records.

20 Q    Okay.  So, you receive $20,000, and you don't know who

21 it was from; is that right?

22 A    I know I received a wire, but without looking at my

23 accounting records, I cannot testify under oath exactly who

24 that came from.  But I'm happy to provide that.

25 Q    Okay.  You filed a non-suit in the Ostrander lawsuit,

1  correct?

2  A     Correct.

3  Q     And the result of that lawsuit is that the lawsuit is

4  non-suited with prejudice, right?

5  A     Correct.

6  Q     So, as we talked about, you were the lawyer for

7  Alliance Farm and Ranch in that case, correct?

8  A     Correct.

9  Q     You sought to be employed by the Alliance Farm and

10 Ranch bankruptcy estate as special litigation counsel,

11 correct?

12 A     Correct.

13 Q     But you non-suited the lawsuit you said because you

14 wanted to comply with the settlement agreement; is that

15 right?

16 A     It was mandatory for the settlement agreement.  Yes.

17 Q     You drafted the settlement agreement, right?

18 A     Yes.

19 Q     Alliance Farm and Ranch isn't a party to the

20 settlement agreement, are they?

21 A     Alliance Farm and Ranch is not a party.  No.  Jerod

22 Furr, as the liquidating agent, is the party.

23 Q     Does it say that he's liquidating agent in the

24 settlement agreement?

25 A     No, it does not.  It says "successors assigned," some

 1  kind of more generic language like that, but that is the

 2  intent of the agreement.

 3  Q    Okay.  So, I pulled up the settlement agreement there.

 4         Do you see where it describes who the recipient

 5  is?  It says, "Jerod Furr, an individual."

 6  A    And also, "any relative, representative, heirs,

 7  executors, as well as successors or assigns," and

 8  collectively that would be liquidating agent for Alliance

 9  Farm and Ranch.

10  Q    Okay.  Which one of those words would be him serving

11  as a liquidator of Alliance Farm and Ranch?

12  A    I think encompassing as successors or assigns.  When

13  you have a defunct entity under the Business Operating Code,

14  basically, the winding down is left in the governance of its

15  members.  Paragraph 8.3 of the Operating Agreement provides

16  that a liquidating agent can be appointed and that that

17  person has the powers and duties to wind down the affairs of

18  the company.

19  Q    Okay.  Under the settlement agreement, Mr. Furr was to

20  receive $1.5 million, correct?

21  A    Yes.  Yes, and like he testified, deposit it into a

22  Debtor-in-Possession account.

23  Q    Can you tell me where in the settlement agreement it

24  says that he has to put it in the Debtor-in-Possession bank

25  account?

1  A     It doesn't because we hadn't obtained one yet as of

2  the time of the settlement agreement, and as of right now,

3  we still don't.  He's tried, but couldn't obtain one, and

4  that's why we -- I said, "Not a problem. We will deposit it

5  into the Registry of the Court," which is what I explained

6  to you on the phone earlier this week.

7  Q     Can you point to anything in this settlement agreement

8  where Mr. Furr would have any obligation to provide any of

9  these funds to Alliance Farm and Ranch?

10  A     I don't think the settlement agreement is somehow

11  separate from his underlying obligations to the Bankruptcy

12  Court to deposit the funds into a Debtor-in-Possession

13  account and pay the million dollars that he testified to

14  previously.  He has to do that.  That's what he testified

15  to, and that's what he knows that I was going to make sure

16  would happen.

17  Q     So, it would be correct to say, yes or no, that

18  there's nothing in the settlement agreement that is an

19  affirmative -- that binds Mr. Furr, it's an affirmative

20  obligation, to provide anything to the Alliance Farm and

21  Ranch bankruptcy estate.

22         That's correct, right?

23  A     Again, I would say his overall arching obligation is

24  to do that regardless of what any agreement to the

25  contrary -- agreements have to follow both Texas and federal

1  law, and he's got a pending bankruptcy --

2            BY MR. HOTZE:  Objection; non-responsive, Your

3  Honor.

4            THE COURT:  Let her finish her -- let her finish.

5            Go ahead, Mr. Crain.

6  BY MR. HOTZE:

7  A    He's got an obligation under the law to, you know,

8  bring all this back to the Bankruptcy Court and present it

9  as he testified earlier.  All of that would have been done

10 with a Motion to Dismiss.  We're working on this settlement.

11 We think we've got a good settlement.  We've worked hard.

12 There would be zero funds for these Creditors.  Zero funds,

13 but for our combined efforts.  We busted our tails in a very

14 short amount of time to provide these funds to these

15 Creditors.

16            And during this week, while I drafted it, I was

17 extraordinarily sick.  I came down with parasites.  So, if

18 there was some kind of phrase that was left out, certainly

19 not intentional.  And as a result of the concerns this week,

20 I got out of my pneumonia sick bed, got on the phone with

21 Trustee as well as yourself, and said, "You have my word.

22 Absolutely, these funds will be put into the Registry of the

23 Court.  They will go towards the bankruptcy.  The bankruptcy

24 will rule and determine the validity of where the funds go."

25            And that's consistent with the response to your

1  motion that I filed yesterday, as well as the Order.  And I

2  think the totality of that shows that we are going to put

3  those funds into the Registry of the Court.

4  Q     Under the settlement agreement, Alliance Farm and

5  Ranch is not directly entitled to any money, correct?

6  A     Correct, they're not.  It goes to the property of the

7  estate, and then the property of the state -- here has to be

8  a Motion to Dismiss, and the Judge determines whether or not

9  they're valid claims.  Absolutely.

10 Q     So, it's your testimony today that you sought to be

11 employed as special litigation counsel for Alliance Farm and

12 Ranch in the litigation with the Ostranders, that you

13 drafted a settlement agreement to resolve the litigation in

14 a way that a million and a half dollars was transferred to,

15 would be transferred to Mr. Furr, and that you would

16 non-suit the lawsuit with prejudice, and that Alliance Farm

17 and Ranch wasn't entitled to receive any money under the

18 settlement agreement; is that right?

19 A     No, that is not correct.  I think my testimony.

20 Q     Which aspect of that is not correct?

21 Q     As I testified previously, the entirety of intent

22 always was to put the funds into a Debtor-in-Possession

23 Chapter 11 bank account in the name of Alliance Farm and

24 Ranch.  Mr. Furr, in his capacity as liquidating agent, can

25 do that.  And once there was a Motion to Dismiss filed and

1   determined by this Court, if there's any valid claims, then

2   Alliance Farm and Ranch, its portion of those funds would be

3   reduced by the Court's determination of valid claims.  So,

4   the rest, the $1 million, we undisputedly would pay back

5   Alliance Energy Partners.

6            BY MR. HOTZE:  I have nothing further, Your

7   Honor.

8            MS. MCINTYRE:  Your Honor, I have a question, if

9   I may?

10            THE COURT:  Yeah.  Go ahead.

11            MS. MCINTYRE:  Your Honor, I'd like to direct the

12   Court's attention to Docket No. 87 filed on the docket.

13   This is a Notice of Appearance Request for Service filed by

14   Deborah Crain.  I think the Court can take judicial notice

15   of this document.  And if I can share my screen, I can throw

16   it up on the screen.

17            THE COURT:  I have it, I have it.

18            MS. MCINTYRE:  Okay.

19                        CROSS-EXAMINATION

20   BY MS. MCINTYRE:

21   Q    Ms. Crain, did you file a Notice of Appearance in this

22   case on or about May 20th, 2025?

23   A    I believe so.  I'd have to look at the document.

24   Q    I'll just note for the Court that this document was

25   filed and states that "Deborah Crain hereby appears as

1  counsel for Jerod, for an individual and an interested party

2  here in."  The signature block says "Attorney for Jerod

3  Furr."  It does not designate him as anything else besides

4  him and his name, with no additional title.

5          And Ms. Crain, do you represent parties in the

6  State Court Action 24-07-11639?

7  A    Yes, I'm co-counsel for Randy Bays in that case.

8  Q    And have you filed or served discovery in that case

9  with the signature block that says co-counsel for Defendants

10 AE Partners Holdings, Inc., AE Partners Holdings, LLC., AEP

11 Asset Holdings, LLC., Alliance Energy Partners, LLC.,

12 Alliance Farm and Ranch, LLC., Invictus Drilling Motors,

13 LLC., Corina Furr and Jerod P. Furr?

14 A    Yes, I believe so.  That's how Mr. Bays represents the

15 totality of those defendants, and we adopted his signature

16 blocks as co-counsel.

17         BY MS. MCINTYRE:  I have no further questions,

18 Your Honor.

19    (Witness steps down)

20         THE COURT:  All right.  Any further testimony?

21         MR. HOTZE:  None for the Committee, Your Honor.

22         THE COURT:  Anyone else have any further

23 testimony?

24    (No audible response.)

25         THE COURT:  All right.

1            MS. MCINTYRE:  No, Your Honor.

2            MS. CRAIN:  Your Honor, I did --

3            THE COURT:  Go ahead.

4            MS. CRAIN:  -- file Exhibits 1 through 6, and

5  I've asked those be admitted into the record.

6            THE COURT:  It is 104, Exhibits 1 through 6.  I

7  think we went through them, what they are.

8            Any objection to Exhibits 1 through 4?

9            MS. MCINTYRE:  I do have an objection, Your

10 Honor.  Heather McIntyre.

11            Exhibit 4 appears to be hearsay, and I don't

12 think there's been any testimony on it.  I don't know where

13 this comes from or what it's supposed to represent.

14            MS. CRAIN:  Your Honor, I think everyone is not

15 disputing that there's a million dollar loan.  For clarity

16 of the record, what I did was I examined both the general

17 ledgers and cash statements for both entities, Alliance

18 Energy Partners as well as Alliance Farm and Ranch, and

19 Alliance Energy Partners shows that it's a note receivable

20 in that amount.

21            And so, to the extent that I want to be

22 completely forthright with the Court and show the exact

23 amount that it showed on its books as being owed, it is

24 slightly more than $1 million.  This actually goes to the

25 benefit of the Creditors, and, I believe, a more accurate

1  amount as reflected on the books and records.  If my client

2  needs to --

3              MS. MCINTYRE:  Your Honor --

4              MS. CRAIN:  -- testify that it's true and

5  correct, you know --

6              MS. MCINTYRE:  Your Honor, I'm going to object.

7  This is a claims liquidation issue, and that's not before

8  the Court today.  I'll not object to the idea that Alliance

9  Energy Partners is owed more than a flat million dollars,

10 but besides that, I think that any testimony about the

11 actual amount of AEP's claim is left better for another day.

12             THE COURT:  The way -- when I saw this exhibit, I

13 interpreted it just to be this -- you know, there's a

14 recognition on somebody's books and records, and I don't

15 know whether this was a contemporaneous document or whether

16 it was a document that was prepared for litigation, but that

17 there was a -- and I didn't understand why it's a note

18 because I haven't seen a note, but it is a receivable from

19 Alliance Farm and Ranch.  That's the way that I understood

20 this document.  I didn't -- this is not a claim.

21             I'm not accepting the fact that this is the

22 amount of the claim or that the other ones are correct.  You

23 know, I was just looking at the highlighted thing as being,

24 you know, there's a million dollars that somebody claims is

25 on the books.  So, I don't have a problem admitting that.

1            All right.  So, any other objections?

2        (No audible response.)

3            THE COURT:  All right.  So, Exhibits 104-1

4   through 104-6, with that caveat, will be admitted.

5            All right.  So, I had a hearing starting at

6   10:00.  So, why don't we take another 15 minute break?  I

7   have two quick hearings, and then we'll come back and finish

8   this up.  And if there's any more testimony, we'll take

9   that, and then I'll let everybody make closing arguments.

10            Okay.  Thank you.

11        (Recess taken from 10:17 a.m. to 10:30 a.m.)

12            THE COURT:  All right.  It's 10:30.  We'll go

13   back on the record in Alliance Farm and Ranch, 25-30155.

14            All right.  Any further testimony?

15            MR. HOTZE:  None from the Committee, Your Honor.

16            MS. MCINTYRE:  None from me, Your Honor.  Thank

17   you.

18            MS. CRAIN:  None for us, Your Honor.  Thank you.

19            THE COURT:  All right.  All right.

20            MR. HOTZE:  If it makes sense, Your Honor, I was

21   going to go ahead and do closing statements.  I'm more than

22   happy to kick that off, and I think I can keep this

23   relatively brief.  I know we've been going for quite some

24   time now.

25            THE COURT:  Got you.

1         MR. HOTZE:  Your Honor, the Committee very

2   recently formed.  We've been in this for a little bit less

3   than two weeks, and the amount of things that we found out

4   in this short period, to me, is (indiscernible).  The Motion

5   to Plead filed yesterday solely focused on the settlement

6   agreement, because that was the thing we could get our arms

7   around the best.

8         As, you know, I think Ms. McIntyre demonstrated

9   with some of her exhibits and testimony, there seems to be a

10  lot more under the surface of this than just the settlement

11  agreement, but I think the settlement agreement is more than

12  enough, Your Honor.

13        Mr. Furr testified that he listed that lawsuit as

14  an asset of the Debtor's estate.  He testified he entered

15  into a settlement agreement with the Ostrander to resolve

16  that lawsuit.  He testified that the Debtor, Alliance Farm

17  and Ranch, was the Plaintiff of that lawsuit, whose assets

18  that claim was not a party to the settlement agreement.  He

19  testified that he represented to the Ostranders that he'd

20  release all of AFR's claims related to the wrongful

21  foreclosure, they cause the lawsuit to be dismissed.

22        He testified that he would personally be entitled

23  to $1.5 million out of that settlement.  Taking together

24  (glitch in the audio) fiduciary, and he testified that he

25  knowingly and willingly is attempting to convert estate

1  property for his own benefit.  And I understand that there

2  was argument made that, "Oh, he's definitely going to put it

3  in the Registry of the Court.  He definitely was (glitch in

4  the audio) Creditors, and his own judgment was going to

5  decide what Creditors were owed what," but that's not how

6  any of this works, Your Honor.  This isn't a (indiscernible)

7  case.  He knowingly and willingly was trying to take money

8  that would have gone to Unsecured Creditors, who aren't

9  going to get paid in full on amounts they're entitled to.

10       I think, Your Honor, this is more than ample

11 evidence.  Falls under 1104(a)(1).  He can't be a fiduciary

12 for this estate.  And as I said in court on Tuesday, Your

13 Honor, I think there's a really simple solution that

14 resolves all of the problems in this case, Your Honor, which

15 is that we appoint an 11 Trustee.  As it was testified to

16 today, there is a buyer for this property.

17       The Ostranders, I believe -- I'll let Mr. Gibbs

18 speak to this.  The Ostranders are more than willing to

19 enter into a settlement agreement with the Chapter 11

20 Trustee to substantially similar economic terms.  I also

21 believe that Mr. Etters's counsel will tell you that if the

22 money is going to come into the estate, they'll drop their

23 *lis pendens*, which is holding up that sale.  So, you would

24 have a bankruptcy estate with a million and a half dollars.

25 All of the infighting, for now, would be resolved.

1      The Ostranders could get out of this case and get

2   the relief that they want.  And then, from there, the 11

3   Trustee could decide whether or not to pursue a plan, to

4   pursue some sort of reorganization, if that money would

5   allow the money to restart, if that made economical sense,

6   or (glitch in the audio), you know, judgment was converting

7   was better at that point.

8      But the reality is that there's a million and a

9   half dollars on the table right now for the estate.  There's

10  a buyer who they've been pushing off a couple of times, and

11  if we let this go on and on, we may lose that buyer.  And

12  there's not a lot of buyers for multimillion dollar

13  properties where this property's at.

14      So, it's the Committee's position that it's in

15  the best interest of the Debtor's estate and the Creditors

16  to have an 11 Trustee promptly so that the sale can be

17  consummated next week and the proceeds can come to the

18  Debtor's estate.  So, I won't belabor the point.  I have

19  grave reservations that --

20      (People speaking in the background.)

21      MR. HOTZE:  I have grave reservations that we

22  have an estate professional.  We've testified that they

23  drafted a settlement agreement that, in effect, diverted a

24  million and a half dollars of the property of the estate to

25  an insider of the Debtors.  That's not really what we're

1  here about today, but I do think it's further cause for

2  concern that the fiduciary is not exercising his judgment

3  responsibly in this case.

4          So, with that, Your Honor, I'll pass the

5  metaphorical podium.

6          THE COURT:  All right.

7          MS. MCINTYRE:  Thank you, Your Honor.

8          Heather McIntyre on behalf of Dustin Etter.  I

9  have some brief closing remarks as well.

10          I originally filed this Motion to Convert to

11  Chapter 7.  I think the evidence before the Court is

12  sufficient and substantial to warrant a conversion to

13  Chapter 7.  I'll defer -- Mr. Etter will defer to the

14  Court's discretion as to whether a Chapter 11 or a Chapter 7

15  Trustee should be appointed.

16          In this case, for the Alliance Farm case, you

17  have the litigation claims and some personal property that

18  Jerod Furr has not preserved and has actually tried to

19  divert to himself personally.  He has testified that there

20  are no operations, no employees.  There is no reasonable

21  likelihood of rehabilitation.

22          And so, the metrics are met under 1112(b)(4)(A)

23  for conversion to Chapter 7.  (b)(4)(B) is conversion under

24  gross mismanagement.  I believe that it is clear before the

25  Court that Mr. Furr tried to divert, again, property of the

1  estate to himself individually.

2          You heard from Mr. Meek earlier this week, the

3  state court litigator for Mr. Etter, who made statements

4  before the Court that he has repeatedly requested that

5  Mr. Furr agree to put the Ostrander litigation funds into

6  the Court Registry, or the sale proceeds into the Court

7  Registry, and was repeatedly not -- that request was denied.

8  You have formal counsel of AFR withdrawing after learning of

9  a settlement agreement, discussing it with their client, and

10  then realizing that they had irreconcilable differences that

11  required their withdrawal.

12          This case also lacks good faith under the Little

13  Creek factors.  It was a single asset real estate, which

14  real estate was actually foreclosed upon the day before

15  filing.  You have evidence that Mr. Furr diverted $70,000 of

16  AFR funds from the Frost bank account the day of the filing

17  of the AFR bankruptcy.  There was only one Creditor listed,

18  the AEP "million dollar loan" for which there is no note.

19  The Court has heard testimony that AFR received funds from

20  Invictus and AEP, and those Frost bank statements also show

21  the parent company, AE Partners Holdings, funding AFR, and

22  yet, none of those potential claims were listed.

23          And at this -- the Little Creek factors for a

24  lack of good faith are also met here.  So, Mr. Etter would

25  assert that there are three separate bases to convert to

1   Chapter 7 here, in addition to everything that UCC counsel

2   found in the two weeks since they've been appointed.

3           Likewise, in Alliance Energy Partners, the facts

4   before the Court are that AEP has failed to file a Statement

5   of Financial Affairs.  Mr. Furr failed to list the claims

6   that AEP has against AFR in its schedules.  AEP has no

7   operations.  It ceased operating last fall.  It has no

8   employees.  There are allegations of wrongdoings against

9   Mr. Furr in the eighth amended petition.  That's at Docket

10  No. 80-11 in the state court litigation.  The claims that

11  AEP has against AFR are not being pursued.  The claims AEP

12  has against Mr. Furr are not being pursued.  They're not

13  listed.

14          So, under (b)(4)(A), diminution of property of

15  the estate and no reasonable expectation of rehabilitation

16  is met, which would weigh in favor of converting to

17  Chapter 7.  Likewise, all of the evidence before the Court

18  suggests gross mismanagement and a fiduciary that is willing

19  to divert property of the estate to himself individually.

20          In addition, the Little Creek factors for lack of

21  good faith are met also in the AEP bankruptcy.  There are no

22  employees, no operations, no cash flow, allegations of

23  wrongdoing against the principal, and the apparent only

24  assets of AEP are its litigation claims against Mr. Furr and

25  AFR, and perhaps other entities that we don't know.  AEP has

1  failed to file the SOFA, which is required under the

2  bankruptcy rules.  They have not moved to extend some time

3  for filing the SOFA.  So, multiple reasons exist to convert

4  AEP to Chapter 7 as well.

5          However, I will deter to the Court's decision on

6  whether or not that should be a Chapter 11 Trustee or a

7  Chapter 7 Trustee, but it's in the best interest of the

8  Creditors here to have a fiduciary in place that understands

9  that you can't divert property of the estate to himself, or

10  after getting caught, decide that he will then put the funds

11  in the Court Registry.

12          And I appreciate the Court's time and

13  (indiscernible) hearing on the matter and indulgence in the

14  evidence that the Court was willing to hear this morning.

15          Thank you.

16          MS. CRAIN:  Thank you, Your Honor.

17          Your Honor, I think there's some disagreements

18  about the timeline and the series of events that have

19  occurred.  And you know, to have my good name disparaged, to

20  say, it's quite striking for me.  I've worked very hard for

21  my reputation and, obviously, twice been appointed as

22  special counsel for the litigation in the bankruptcy matter.

23          I think that what has transpired has been a

24  breakdown in communication, probably between Mr. Furr and

25  Mr. Wentworth, and then likewise, both of our schedules

1  being out of time, and me being extraordinarily sick almost
2  non-stop since May, the early part of May.  In fact, as I
3  testified earlier, Your Honor, as the settlement agreement
4  was being drafted, I was violently ill, violently ill.
5          On May, I'm sorry, April the 25th, 2025, Mr. Furr
6  asked Mr. Wentworth to file a Motion to Dismiss the
7  bankruptcy of Alliance Farm and Ranch.  The grounds to that
8  Motion to Dismiss are similar to what we saw this week, that
9  we've got a settlement in place, we're working towards that
10  settlement, and you know, it's going to be reduced to
11  writing, "Here's the million dollars I promised that I'd pay
12  Alliance Energy Partners," he set that forth in his
13  Declaration.
14          I want to reiterate, Your Honor, that but for our
15  efforts fighting for the last months, very diligently
16  working with the Ostranders to get that money, there would
17  be no money for the estate.
18          Likewise, Your Honor, that settlement agreement
19  was provided to the Trustee upon request, and also, we
20  explained to them that, "If you want us to put it into the
21  Registry of the Court, especially since we were unable to
22  get a Debtor-in-Possession account, we're happy to do that."
23  There's no getting caught here.
24          We voluntarily disclosed that information.  We
25  voluntarily gave that to the bankruptcy attorney a week ago.

1  During the time period between that also and Tuesday, we're

2  forced with a decision, either don't file a dismissal and

3  potentially losing all this money for the Creditors, and not

4  having that money available to the bankruptcy estate.

5        My client testified that it's good faith, that he

6  understood that the Motion to Dismiss would be required to

7  be heard by Your Honor, that Your Honor would be the

8  determiner of fact whether or not that Alliance Farm and

9  Ranch had any valid Creditors, or claims and causes of

10 actions, and that no dismissal would be granted unless and

11 until Your Honor deemed it appropriate.  And we certainly

12 abide by the Court's rulings and decisions.

13        And certainly, the funds will go a long way

14 towards resolving these Creditors when they wouldn't have

15 had any before.  Likewise, with the filing yesterday, my

16 client said, "Just file a consent order."  You know, we

17 don't have a problem of purring this money into the Registry

18 of the Court because we want to show our good faith, and our

19 diligence, and our efforts to obtain these monies for these

20 Creditors that, like I said, would not otherwise be

21 available.

22        I understand the time constraints and how some of

23 that appears, Your Honor, but none of those allegations have

24 a single bit of merit.  My client's never testified that he

25 would convert those assets to himself.  What he said is he

1  acted as the liquidating agent and went to four banks to be
2  able to deposit those funds as a Chapter 11 Trustee, and
3  then appropriately pay the funds as the Court directs, which
4  we agree is the proper way to do.  Agree to the consent
5  order.  I think that makes the Chapter 11 Trustee moot
6  issue, as well as, Your Honor, agreeing to a consent order
7  for us to be able to sell the personal property so that the
8  full $1.5 million comes into the estate and not some lesser
9  amount.

10          Your Honor, we've worked very diligently, and we
11  will do whatever the Court asks us to do to make sure that
12  these Creditors are paid as -- made as whole as possible.

13          Thank you, Your Honor.

14          MR. GIBBS:  Your Honor, very briefly.  Tres Gibbs
15  here on behalf of the Ostranders.

16          I know we've been largely on the sideline here
17  today.  We don't have a pending motion or we hadn't filed a
18  response to any of the motions, but I'd be remiss if I
19  didn't say when we were before you, Your Honor, on the
20  Ostranders' Motion to Dismiss back in April, and certainly,
21  upon receiving the Court's Order on that Motion to Dismiss,
22  I certainly did not intend to be before you until we were
23  going to be presenting a motion under 9019 to approve a
24  compromised agreement.  So, I certainly regret circumstances
25  that brought us here this morning.

1          But that aside, Your Honor, I believe Mr. Hotze

2    has a very clear-eyed view of the situation here, and the

3    Ostranders are supportive of the Committee's recommendation.

4    We do believe that that is the most expedient way to proceed

5    so that the estate can get a proper fiduciary and so that

6    the sale, which, again, is the most valuable asset, only

7    asset in the estate, can go forward, and we don't lose that

8    buyer.

9          So, with that, Your Honor, that's all we have.

10   Thank you.

11          THE COURT:  Okay.  Anything further?

12          MR. HOTZE:  Nothing from the Committee, Your

13   Honor.

14          THE COURT:

15          MR. TRAVIS:  Your Honor, if I may?  Ross Travis

16   for the US Trustee.  I'm stepping in for Mr. Nguyen, who had

17   to drop off the call to go argue in front of Judge

18   Rosenthal.

19          I would say, you know, our perspective if there

20   do seem to be some pretty big trust issues here between the

21   Creditors and UCC and the Debtor-in-Possession.  This case

22   does need to proceed forward.  The US Trustee has already

23   begun, you know, doing the preliminary steps required under

24   the code to appoint a Chapter 11 Trustee, if the Court so

25   orders, and we believe that we could get that appointment

1  turned around in very short order if that's what the Court

2  deems appropriate today.

3          THE COURT:  All right.  Thank you.

4          All right.  So, I've reviewed all of the filings.

5  Obviously, I've listened to extensive testimony today, and I

6  don't know if we're in a situation where it was a

7  miscommunication, or whether there was malfeasance, or

8  whether there was, you know, things fell between the lip and

9  the cup.  There's a couple of facts that I find that really

10 require an independent fiduciary to evaluate.

11         The dismissal of the lawsuit, the non-suit of the

12 lawsuit without a Court Order, I have a very difficult time

13 understanding that under any circumstance.  The settlement

14 agreement, the implementation of the settlement agreement,

15 you know, with Mr. Furr as opposed to with the person who

16 owned the claim, which is a Debtor, I don't understand that

17 either.

18         And frankly, you know, the reliance on him being

19 a liquidating agent under the operating agreement would make

20 a lot of sense, but for the fact that the Debtor's in

21 bankruptcy, and once you're in bankruptcy, the whole

22 corporate structure and whole corporate government changes.

23 So, I'm in a situation where I do believe that there is a

24 need for an independent fiduciary, number one.

25         Then, the question becomes in my mind, you know,

1  should that be a Chapter 7 Trustee or a Chapter 11 Trustee?

2  You know, in this circumstance, I think the burden has been

3  met with respect to both appointments, but I think, in this

4  circumstance, because of the nature of the dual Debtors, the

5  fact that, you know, one Debtor has the assets, the other

6  Debtor has the claims, the intercompany claims, I think a

7  Chapter 11 Trustee would probably more nimble in being able

8  to assert this.  And it appears that the main asset that

9  this company has are litigation claims or potential

10 litigation claims.

11        And the other thing, there was no question but

12 that the foreclosure did not include the personal property.

13 There was no -- nobody contested the fact that the

14 foreclosure did not include the personal property.  Selling

15 property outside the ordinary course of business requires a

16 Court Order.  Period.  End of story.  I don't understand how

17 that could be "included in the purchase price" when it's a

18 Debtor asset.

19        So, I'm going to go ahead and appoint a

20 Chapter 11 Trustee.  I'm going to deny the Motion to Convert

21 as moot since I've appointed a Chapter 11 Trustee, and I'm

22 going to deny the Motion to Dismiss as moot because it'll be

23 the Chapter 11 Trustee who will determine whether to move

24 forward on that basis.

25        So, I'll enter an Order later this morning or

1   this afternoon appointing a Chapter 11 Trustee.  We need a

2   little bit more transparency in this process, and we need to

3   follow the rules in the bankruptcy.

4           So, Mr. Travis, please get the Trustee appointed,

5   and let he or she evaluate the situation and move forward

6   with the sale or not, depending on what they determine, but

7   I'm not prejudging that.  And to the extent we need to get a

8   9019 or a sale motion or whatever needs to be on file, we

9   can do that in very short order, if that's what the

10  consensus is.

11          And you all know how to contact Mr. Laws to get a

12  hearing.

13          All right.  So, we're in recess until Tuesday

14  morning.  Monday is Memorial Day.

15          All right.  Thank you, all.

16      (The parties thank the Court)

17      (Hearing adjourned at 10:54 a.m.)

18

19

20

21

22

23

24

25                          *  *  *  *  *

1          *I certify that the foregoing is a correct*

2  *transcript to the best of my ability due to the condition of*

3  *the electronic sound recording of the ZOOM/video/telephonic*

4  *proceedings in the above-entitled matter.*

5  */S/ MARY D. HENRY*

6  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9  *JTT TRANSCRIPT #70242*

10  *DATE FILED:  NOVEMBER 24, 2025*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25